1  **KERSHAW, CUTTER & RATINOFF, LLP**
   William A. Kershaw (State Bar No. 057486)
2  Email: wkershaw@kcrlegal.com
   C. Brooks Cutter (State Bar No. 121407)
3  Email: bcutter@kcrlegal.com
   Stuart C. Talley (State Bar No. 180374)
4  Email: stalley@kcrlegal.com
   John R. Parker, Jr. (State Bar No. 257761)
5  Email: jparker@kcrlegal.com
   401 Watt Avenue
6  Sacramento, California  95864
   Telephone: (916) 448-9800
7  Facsimile:  (916) 669-4499
8  

9  **WEXLER WALLACE LLP**
   Mark J. Tamblyn (State Bar No. 179272)
10 Email: mjt@wexlerwallace.com
   Ian J. Barlow (State Bar No. 262213)
11 Email: ijb@wexlerwallace.com
   455 Capitol Mall, Suite 231
12 Sacramento, California 95814
   Telephone:  (916) 492-1100
13 Facsimile:  (916) 492-1124
14 

15 Attorneys for *Plaintiff*

16 

17                      UNITED STATES DISTRICT COURT

18                      NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 19  REBECCA SWIFT, on behalf of herself and all others similarly situated, | Case No.  CV 09-5443 SBA |
| 20 | **CLASS ACTION** |
| 21           Plaintiff, | |
| 22     v. | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF:** |
| 23 | (1)  **THE UNFAIR COMPETITION LAW;** |
| 24  ZYNGA GAME NETWORK, INC., ADKNOWLEDGE, INC.; D/B/A SUPER REWARDS; KITN MEDIA USA, INC., D/B/A SUPER REWARDS; | (2)  **THE CONSUMERS LEGAL REMEDIES ACT; AND** |
| 25 | (3)  **UNJUST ENRICHMENT.** |
| 26           Defendants. | **JURY TRIAL DEMANDED** |
| 27 | |
| 28 | |

-1-

Plaintiff Rebecca Swift ("Plaintiff"), individually and on behalf of all others similarly situated, alleges by and through her attorneys, upon information and belief, as follows:

## NATURE OF THE ACTION

1.  This case seeks to remedy a fraudulent scheme perpetrated by Defendants to lure unsuspecting consumers into signing up for services and goods that they do not want or need. Specifically, the Defendant Zynga Game Network Inc. ("Zynga") is in the business of developing and making available to users of Facebook, MySpace, and other social networking sites a large variety of popular on-line games including without limitation Mafia Wars, Zynga Poker, FarmVille, Vampires, YoVille!, and Roller Coaster Kingdom.

2.  Users are allowed to play the Zynga's games free of charge. Since its inception, however, Zynga has admittedly sought to generate as much revenue as possible through its "free" games by "monetizing" them. Although most "free" content made available on the internet is supported through traditional banner advertising, where advertisers pay for the right to present advertisements that appear next to or along with the "free" content, Zynga has taken a different tack. Instead of hosting advertisements to its users, Zynga generates revenue by selling virtual currency to players within the games that it has developed.

3.  Each of Zynga's games is social in nature, allowing the players to create an online persona or avatar that can interact with other players' persona or avatar. Each of these games is also competitive, allowing players to compare their virtual accomplishments with each other, and in many cases, allowing them to compete with each other directly within the game. For example, in the game Mafia Wars, the player creates a virtual persona, a fledgling criminal who may advance within the criminal world by committing various illegal acts within the game. A player in Mafia Wars can also "attack" another player. The more "powerful" player—the player who has acquired more virtual goods and services for his or her persona within the game—will normally win, acquiring in-game benefits, and the player who loses will suffer some sort of detriment to his online persona within the game.

4.  Each game is designed to be more enjoyable for users who have acquired

increasing amounts of virtual currency. Players who have acquired this virtual currency in each game can use it to acquire more in-game goods and services, to unlock new levels of the game, to better compete against other players, or to otherwise make the game more enjoyable. Virtual currency can be acquired when players slowly "earn" it by accomplishing various tasks in the game, through means that are entirely dictated by Zynga. When players "earn" their own virtual currency within these games, however, Zynga gains nothing—which is why it may be "earned" very slowly. Accordingly, Zynga has pushed its users to acquire virtual currency in ways that directly enrich Zynga.

5. Specifically, Zynga encourages its users to acquire virtual currency and online goods and services within Zynga's games in a manner that produces revenue for Zynga. Generally, users can purchase this virtual currency and online goods and services directly from Zynga. However, most Zynga game users are unwilling to pay real-world money for "virtual currency" inside of a video game.

6. Accordingly, Zynga provides another way for users to acquire virtual currency: through "special offer" transactions that Defendants have created and developed to be integrated within each of Zynga's game applications. Through these "Integrated Special Offer Transactions," or "ISOTs," Zynga provides users in-game virtual currency in exchange for users' participation in "special offers" provided by Zynga and its business partners, including Defendants Adknowledge, Inc., and KITN Media USA, Inc., both doing business as "Super Rewards" ("Super Rewards" or "Super Rewards Defendants").

7. Zynga has partnered with other companies, including without limitation Offerpal, Super Rewards, DoubleDing, and Gambit—some or all of which plaintiff is informed and believes are funded by Zynga's principals and investors—to create and develop these ISOTs. These ISOTs, generally referred to in the industry as "lead-gens" (lead generators) have caused the widespread deception of Zynga's users.

8. Plaintiff is informed and believes and on that basis alleges that these Integrated Special Offer Transactions, or ISOTs, work as follows: Zynga partners with an offer aggregator like, for example, the Super Rewards Defendants. Zynga and Super Rewards create and develop

-3-

1  the interfaces within Zynga's games that allow Zynga game users to select a "special offer" in
2  exchange for virtual currency. Defendants have created and developed the ISOT such that after
3  the user selects a false and misleading "special offer" in order to obtain virtual currency within a
4  Zynga game. As soon as the user has completed the "special offer" presented by Zynga, Super
5  Rewards, and another Zynga business partner—whether a "wiki toolbar," "IQ Test," "Video
6  Professor," or "GreenTea Purity," the Zynga business partner pays Zynga and Super Rewards for
7  the lead generation and Zynga remits to the user a certain amount of in-game virtual currency.
8  Zynga, Super Rewards, and their business partners are aware that the ISOTs presented to users of
9  Zynga game applications are false and misleading.

10  9.  Users of Zynga game applications who have participated in these false and
11  misleading ISOTs created and developed by Defendants then enjoy the virtual currency that
12  Zynga has offered ("click on this special offer to receive Yocash") and then remitted to users
13  within Zynga's game applications.

14  10.  Plaintiff is informed and believes and on that basis alleges that this somewhat
15  complicated structure was specifically created in an attempt to shield Defendants from liability as
16  a result of the deceptive and misleading ISOTs that they developed and created with their
17  business partners, at least some of which may be owned or controlled by Zynga and its principals.

18  11.  For example, plaintiffs are informed and believe and on that basis alleges that offer
19  aggregator DoubleDing, which has worked with Zynga to produce false and misleading ISOTs
20  within Zynga games, is a company funded and founded by Zynga CEO Mark Pincus.

21  12.  For example, FarmVille is a game that is promoted and made available through
22  Facebook's social networking site. This game presents a "virtual world" where players can start
23  and manage their own virtual farmers. In this game, users must have game cash to expand their
24  farm, purchase supplies, etc. Zynga allows FarmVille players to purchase this virtual cash
25  directly with a credit card or, alternatively, the user can participate in an ISOT developed and
26  created by Defendants to appear within Zynga's games.

27  13.  One of the ISOTs that has often appeared within various Zynga games is an on-
28  line "IQ test." The ISOT indicates that the user can earn additional virtual currency by obtaining

-4-

a certain score on an on-line IQ test. To take the test, the user must provide his or her cell phone number and is told that the results of the test will be sent to the user via text message. However, what the user does not know is that by providing his or her cell phone number, the user has unwittingly subscribed to a useless Short Message Service ("SMS") subscription and will be billed on a monthly basis through his or her cell phone bill. Users who manage to discover the obscure charge on their phone bills are then met with hurdles as they attempt to cancel the service and/or obtain a refund. This is just an example of the many deceptive ISOTs developed and created by Defendants that have harmed consumers throughout the United States. A description of how these scams work, including a demonstrative video clip, is available at Michael Arrington, *"Horrible Things" Slink Back Into Zynga*, TechCrunch, Nov. 7, 2009, http://techcrunch.com/2009/11/07/horrible-things-slink-back-into-zynga/.

14. These ISOTs have repeatedly misled and defrauded users of Zynga games. The ISOTs developed and created by Defendants entice Zynga game users into participating in business transactions, such as the IQ quiz described above, that, if conducted legitimately, simply would not produce sufficient revenue for Zynga's purposes. Accordingly, Defendants have acted in concert to create and develop ISOTs reasonably calculated to deceive persons of ordinary prudence and comprehension, and have used the mails and interstate communication wires in furtherance of their scheme.

15. Zynga has specifically admitted that, at least for the first several years of the company's existence, these false and misleading Integrated Special Offer Transactions were necessary for the business to succeed.

16. Recently, executives of Zynga admitted that these Integrated Special Offer Transactions appearing within Zynga's game applications were designed to mislead consumers and generate increasing revenue for its business. In a recent speech, Zynga CEO, Mark Pincus, described how shortly after founding Zynga he desperately needed revenue in order to keep control of his company. He then boasted that this revenue was primarily generated through scams like the one described above:

> "Like I needed the revenue now. So, so **I funded the company myself but I did every horrible thing in the book to just get revenues right away.** I mean we gave our users poker chips if they downloaded this wiki toolbar, which was like . . . I don't know. I downloaded it once and I couldn't get rid of it. **We did anything possible to just get revenues so that we could grow and be a real business.**" (Emphasis added.)

17. After making this public admission, many media outlets began to question Zynga's practices surrounding its ISOTs. In response to this controversy, in November 2009 Zynga purported to have banned all ISOTs within its game applications. In fact, in a belated acknowledgement that Zynga's ISOTs were deceptive or worse, Zynga's CEO recently conceded that all such offers would be banned "*until we see any that offer clear user value.*"

18. Now, as of February 2010, Zynga has brought a few integrated special offer transactions back to its games, claiming that it has weeded out those ISOTs that were repeatedly misleading and defrauding Zynga's users.

19. Zynga CEO Mark Pincus has also followed up on his comments that at Zynga he "did every horrible thing in the book just to get revenues right away," stating that

> "that was a video, uh, that was taken while I was giving a talk, uh, about a year earlier and it was part of a series of talks that I have given since then to entrepreneurs and they're all on the web and I invite people to watch all of them and **the real point I was making was that, as entrepreneurs, we ought to have profitable services as early as we can so we can control our destinies and so we can be in a position, as my company was recently, to do the right thing and make the long-term decisions like, get rid of all offers**." (Emphasis added.)

20. Thus, Zynga's own CEO has effectively admitted that Zynga has known for some time that the ISOTs and its partners designed and promoted were taking advantage of Zynga's users, and that it was necessary for Zynga to generate enough revenue from these false and misleading ISOTs so that Zynga, flush with cash, could "do the right thing."

21. However, despite taking these steps, Defendants have not offered to reimburse any of the millions of users who have been misled by the bogus ISOTs.

## JURISDICTION AND VENUE

22. The aggregate amount in controversy for the Class exceeds $5,000,000. Plaintiff seeks to certify a nationwide class consisting of individuals who reside in all 50 states. Defendants Zynga Game Network, Inc., Adknowledge, Inc., and KITN Media USA, Inc., are Delaware corporations with their principal place of business in San Francisco (California), Kansas City (Missouri), and Santa Monica (California), respectively. Diversity, therefore, can be found because, under U.S.C. §1332(d)(2)(A), a member of the class of Plaintiffs is a citizen of a state different from one of the Defendants. No exceptions to jurisdiction under U.S.C. §1332(d) apply. Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(d) also known as the Class Action Fairness Act.

23. Venue in this District is proper in that Defendants do business in the District, Defendant Zynga maintains its principal place of business in the District, and the Plaintiff resides in the District.

## INTRADISTRICT ASSIGNMENT

24. Pursuant to Local Rules 3-5(b) and 3-2(d), assignment to the San Francisco Division is proper because defendant Zynga Game Network, Inc. maintains its principal place of business in San Francisco County and a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in San Francisco County.

## THE PARTIES

25. Plaintiff Rebecca Swift is a resident of Santa Cruz, California. During the class period Mrs. Swift used various Zynga game applications within the Facebook network, including Farmville, Mafia Wars, YoVille!, and Roller Coaster Kingdom. In each of these applications, Zynga attempted to induce her to earn virtual in-game currency by accepting ISOTs with Zynga and its business partners, including the Super Rewards Defendants. The Plaintiff was misled by the ISOTs created, developed, and promulgated by the Defendants and, as a result, has suffered damages as described below.

26. Defendant Zynga Game Network, Inc., is a Delaware corporation with its principal place of business at 365 Vermont St., San Francisco, California 94103.

27. Defendant Adknowledge, Inc., is a Delaware corporation with its principal place of business at 4600 Madison Avenue, Suite 1000, Kansas City, Missouri, 64112.

28. Defendant KITN Media USA, Inc., is a Delaware corporation with its principal place of business at 3003 Exposition Boulevard, First Floor, Santa Monica, California 95833.

29. Defendant Adknowledge, Inc., and Defendant KITN Media USA, Inc., have both done business under the name "Super Rewards" and are referred to herein as "Super Rewards" and "Super Rewards Defendants."

30. Plaintiff is informed and believes and on that basis alleges that at all relevant times each of the Defendants named herein was an agent, employee, manufacturer, supplier, distributor, designer, engineer, retailer, seller, franchisee, representative, partner, joint venturer, alter ego, and related or affiliated entity or providers of services to or on behalf of each of the other Defendants. Plaintiff is informed and believes and on that basis alleges that Defendants and other unnamed third parties conspired and combined among themselves to commit the acts complained of herein and that each was the joint venturer and/or partner of the other.

## **FACTS**

**A.     General Allegations**

31. Zynga promotes itself as the top social gaming company on the web, providing a network of on-line games that can be played by subscribers of networking sites such as Facebook and MySpace. Mafia Wars, YoVille!, FarmVille, and Poker are among the many games that are published and hosted by Zynga. It is estimated that more than 40 million individuals throughout the United States are active players of Zynga's games.

32. There is no cost to users who want to play Zynga's games. However, to earn revenues, Zynga has intentionally designed its games so that they can be "monetized." What this means is that all of Zynga's games allow users to collect virtual currency that can be used throughout the game to purchase virtual items or unlock options that make the games more enjoyable. The only way that this virtual currency can be collected is by 1) earning it on-line by

-8-

accomplishing virtual tasks; 2) buying it directly from Zynga with a credit or debit card; or 3) participating in an Integrated Special Offer Transaction or ISOTs developed and created by Defendants and described more fully above.

33. Historically, most, if not all, of the ISOTs within Zynga game applications have been scams, which is why all ISOTs were apparently removed from Zynga games in November 2009, and only a handful of ISOTs are now available within Zynga games as of February 2010. Zynga now claims that it has eliminated ISOTs that are misleading to consumers.

34. The ISOTs created and developed by Defendants are highly misleading and often result in users subscribing to goods or services that they do not want or need. Consumers who attempt to cancel services or obtain refunds are then met with roadblocks designed to thwart cancellation and/or refunds or otherwise "save" the customer.

35. Over the past four years, Zynga has generated enormous profits through these false and misleading special offers. In fact, Andre Trader, co-founder of Zynga, has admitted that these false and misleading "special offers" are a large reason for Zynga's growth and have accounted for up to one-third of Zynga's revenue. With industry sources estimating annual revenue from $100 million to $250 million per year, this means that Zynga has potentially obtained $33 to $84 million per year from consumers responding to the "special offers" it promotes and promulgates through its on-line games.

**B.     Facts Specific To Plaintiff**

36. During the class period, Plaintiff, Rebecca Swift, has used various Zynga game applications within the Facebook network, including FarmVille, Mafia Wars, YoVille!, and Roller Coaster Kingdom. She has been exposed to lengthy, consistent and widespread marketing and promotion of integrated special offer programs within Zynga game applications. In each of these applications, Zynga has attempted to induce her to earn virtual in-game currency by participating in ISOTs with Zynga business partners, including without limitation Super Rewards.

37. Plaintiff is informed and believes and on that basis alleges that in or around April 2009, Mrs. Swift, through an ISOT created and developed by Zynga and Super Rewards, provided her cell phone number to a business partner of Defendants in order to be texted a "code"

-9-

that she could use to redeem for "Yocash"—virtual currency within Zynga's Yoville application. Neither Zynga nor Super Rewards, nor Defendants' business partner informed Mrs. Swift that providing her cell phone would result in charges to her phone bill. Defendants' misleading implementation of the ISOT was a substantial factor in Plaintiff's decision to provide her cell phone number and enter into the transaction. On or about April 16, 2009, and three times afterwards, Mrs. Swift's cell phone was charged $9.99 without her knowledge or consent. Plaintiff is informed and believes and on that basis alleges that all or part of these charges were obtained by Defnedants.

38. On or about June 14, 2009, Mrs. Swift participated in an ISOT for a "risk-free Green Tea Purity Trial" while playing the game YoVille! that was created and developed by Zynga and Super Rewards. The ISOT indicated that Plaintiff could earn virtual YoVille! cash (or "YoCash") if she participated in a "risk free trial" for a green tea herbal supplement. The ISOT indicated that the Plaintiff could cancel the trial anytime within fifteen days of her initial order. To participate in the program, Plaintiff provided her debit card number and was charged $5.95 for shipping and handling. Defendants' misleading implementation of the ISOT was a substantial factor in Plaintiff's decision to provide her cell phone number and enter into the transaction.

39. Mrs. Swift sent an email to Defendants' business partner, the apparent manufacturer of the supplements, asking to cancel her "Green Tea Purity Trial" on or about June 24, 2009, ten days after entering the fifteen-day "risk free trial," after she received, mailed from China, a package of 30 green tea pills and three tea bags.

40. On or about July 4, 2009, an unknown entity named "Support Green Tea" emailed Mrs. Swift, informing her that she would be charged $79.95, despite Ms. Swift's specific prior request to cancel her trial offer. Ms. Swift was unsuccessful at any further attempts to contact "Support Green Tea" via telephone. On July 6, 2009, Ms. Swift's bank account was charged $79.95, as well as a $2.38 "foreign transaction fee." On July 20, 2009, Ms. Swift's bank account was charged $85.90, as well as another $2.38 foreign transaction fee. Sometime afterwards, she received, again mailed from China, a package of 30 green tea pills and three tea bags. The materials shipped to Mrs. Swift are worth far less than the $165.85 charged to Mrs. Swift's

-10-

account after she requested to cancel the "free" trial offer that she accepted in exchange for "Yocash" in Zynga's Yoville application. Despite repeated efforts, Mrs. Swift has been unable to obtain a refund of any of the amounts charged to her for this "risk free" trial.

41. Plaintiff is informed and believes Zynga and the Super Rewards Defendants designed and developed the ISOT described above and shared the funds that were taken from Plaintiff. At all times Zynga and the Super Rewards Defendants were aware, or should have been aware, of the false and misleading nature of the ISOT they presented to Plaintiff. Plaintiff also alleges that Zynga actively encouraged Plaintiff to accept the ISOT at issue through the design and promotion of its on-line games.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all others similarly situated. Plaintiff seeks to represent the following Class ("Class"):

> **All persons in the United States who from November 2005 to January 31, 2009 acquired or accumulated virtual currency or other virtual goods and services within a Zynga game application as part of an integrated special offer transaction presented through that application, and who was charged money as a result thereof.**

43. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Class are business entities for purposes of Plaintiff's claim for relief under the Consumers Legal Remedies Act, Civil Code § 1750, *et seq*. Also specifically excluded are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

44. **Numerosity - Fed.R.Civ.P. 23(a)(1) -** Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed class contains more than 100,000 members. The precise number of

-11-

class members is unknown to Plaintiff. Class members are likely to be known by Defendants, however, and thus, may be notified of the pendency of this action by mail, email, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

45. **Existence and Predominance of Common Questions of Fact and Law – Fed.R.Civ.P. 23(a)(2), 23(b)(3)** - There are questions of law and fact common and of general interest to the class. Said common questions include, but are not limited to, the following:

a. Whether Defendants' conduct as described herein constitutes an unfair, fraudulent or unlawful business practice prohibited by California Business and Professions Code Sections 17200 *et. seq.* and by 18 U.S.C. §§ 1341 and 1343*;*

b. Whether the integrated special offer transactions promulgated and promoted within Zynga's game applications were likely to deceive the public;

c. Whether Defendants conspired to mislead consumers;

d. Whether Defendants and other entities acted in concert and/or were joint venturers in connection with integrated special offer transactions promulgated and promoted within Zynga's game applications;

e. Whether Defendants had a duty to protect users from false and misleading integrated special offer transactions promulgated and promoted within Zynga's game applications;

f. Whether Defendants knew or reasonably should have known that the integrated special offer transactions promulgated and promoted within Zynga's game applications were likely to deceive the public;

g. Whether the Defendants' uniform conduct as described herein violates California's Consumers Legal Remedies Act;

h. Whether Defendants have been unjustly enriched as a result of the conduct described herein;

i. Whether Plaintiff and class members are entitled to restitution, declaratory, and injunctive relief as sought herein.

j. Whether Defendants omitted material facts in connection with integrated special

offer transactions.

k. Whether Defendants' conduct caused damage to Plaintiff and members of the Class, and the appropriate measure of such damages;

l. Whether Plaintiff and the Class are entitled to restitution.

46. Defendants' defenses, to the extent that any such defenses apply, are applicable generally to Plaintiff and the entire Class and are not distinguishable as to proposed Class members.

47. **Typicality – Fed.R.Civ.P. 23(a)(3) -** Plaintiff's claims are typical of the claims of the Class as a whole, all of whom have sustained and/or will sustain damages as a proximate or legal result of the common course of conduct of Defendants. Plaintiff's claims are typical of the Class because Defendants subjected all Class members to the same course of conduct.

48. **Adequacy – Fed.R.Civ.P. 23(a)(4) -** Plaintiff will fairly and adequately protect the interests of the Class and has no interest antagonistic to those of the Class. Plaintiff has retained counsel that are highly experienced in the prosecution of complex consumer class action litigation.

49. **Superiority – Fed.R.Civ.P. 23(b)(3)** - A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the class. Although the injury suffered by each individual class member likely ranges from $100 to $300, injury of such magnitude is nonetheless relatively small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication economy of scale and comprehensive supervision by a single court.

50. In the alternative, the Class may be certified under Rule 23(b)(1) and/or (b)(2), because:

    (a) The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudication with respect to individual Class members that would create incompatible standards of conduct for Defendants;

    (b) The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    (c) Defendants have acted or refused to act on the grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CLAIM FOR RELIEF
### (Against All Defendants for Violation of the Unfair Competition Law)

51. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

52. Defendants' acts and practices, described herein, constitute unlawful, unfair or fraudulent business practices in violation of the Unfair Competition Law, Business & Professions Code sections 17200 et seq.

53. Defendants' acts and practices, described herein, violate the CLRA, Civil Code section 1770, et seq., violate 18 U.S.C. §§ 1341 and 1343, and constitute unlawful, unfair or fraudulent business practices in violation of the Unfair Competition Law, Business & Professions Code sections 17200 et seq.

54. Defendants have engaged in unfair business practices in connection with their ISOTs promulgated within Zynga's game applications in that such conduct undermines or violates the stated policies underlying the CLRA, which seeks to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the

-14-

marketplace. Moreover, the utility of Defendants' conduct, if any, is outweighed by the harm it causes to Plaintiff and the Class. Defendants' acts and practices are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the Class.

55. Zynga and the Super Rewards Defendants formed a scheme or artifice, namely, the Integrated Special Offer Transactions as described herein, which were reasonably calculated to deceive Zynga users of ordinary prudence and comprehension, and have used the mails interstate communications wires in furtherance of their scheme, violating 18 U.S.C. § 1341 and 1343.

56. Plaintiff and the Class have been lost money and were injured in fact by and as a result of Defendants' unfair and unlawful practices.

57. Pursuant to Business and Professions Code sections 17200, 17203 and 17204, Plaintiff, on behalf of himself, the Class and the general public, seeks an order of this Court: enjoining Defendants from continuing the unfair business practices described herein. Plaintiff additionally requests an order awarding Plaintiff and the Class restitution of all monies wrongfully acquired from the class by means of such unlawful acts and practices, so as to deter Defendants and to rectify Defendant's unfair and unlawful practices and to restore any and all monies to Plaintiff and the Class and to the general public, which are still retained by Defendants, plus interest, attorneys' fees and costs pursuant to, *inter alia*, Code of Civil Procedure section 1021.5.

### SECOND CLAIM FOR RELIEF
**[Against All Defendants for Violation of the Consumers Legal Remedies Act]**

58. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

59. Defendants provide "services" within the meaning of Civil Code sections 1761(a), 1761(b) and 1770.

60. Defendants are "persons" within the meaning of Civil Code sections 1761(c) and 1770.

61. Users of Defendants' services, including Plaintiff and the Class, are "consumers" within the meaning of Civil Code section 1761(d) and 1770.

-15-

62. Plaintiff's and each and every Class member's use of the services offered by Defendants constitute "transactions" within the meaning of Civil Code sections 1761(e) and 1770.

63. Defendants' unfair or deceptive acts or practices as described herein were undertaken by Defendants in transactions intended to result or which resulted in the sale of goods and services to consumers, and were intended to induce, and did in fact induce, Plaintiff and the Class to purchase for personal use such good and services, which they would not have otherwise purchased. Further, Defendants' suppression and/or concealment of the material facts as described herein was calculated to induce, and did in fact induce, Plaintiff and the Class to provide valuable consideration to Defendants.

64. Defendants' joint and concerted practices, acts and course of conduct as described herein violates the Consumers Legal Remedies Act ("CLRA") in that they caused the following unfair and deceptive practices to occur:

    A. Defendants "represent[ed] that goods or services . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;" in violation of section 1770(a)(5) of the CLRA

    B. Defendants advertised goods and services with the intent not to sell them as advertised. Civ. Code § 1770(a)(9);

    C. Defendants represented that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. Civ. Code § 1770(a)(14); and

    D. Defendants "represented that the transactions were supplied in accordance with a previous representation when they were not" in violation of section 1770(a)(16) of the CLRA

65. Defendants' practices, acts and course of conduct as described above, are likely to mislead a reasonable consumer acting reasonably under the circumstances to her or her detriment. In engaging in their violations of the CLRA, Defendants actively concealed and failed to disclose material facts about the true characteristics of the integrated special offer transactions in which Plaintiff and the Class Members participated.

66. Defendants engaged in these unfair and/or deceptive acts and practices with the intent that they result, and which did result, in completed, false, and misleading integrated special offer transactions alleged herein. As a direct and proximate result of Defendants' violations of law, Plaintiff and the Class have been injured. Pursuant to the provisions of Civil Code section 1782, Plaintiff provided notice to Defendant Zynga in conjunction with the filing of the original Complaint in this action (although the Complaint is an appropriate notice of violations) of her intention to seek damages under Civil Code sections 1750 et seq. unless Zynga corrected, repair, replace or otherwise rectify Zynga's violations of the CLRA. The notice demanded that Zynga take steps as are appropriate to rectify the violations and requiring Defendants to give notice to all affected consumers of their intent to act. A similar letter is being sent in conjunction with this First Amended Complaint. Zynga has already failed to respond adequately to her first letter to Zynga, and now seeks actual and punitive damages from Zynga according to the CLRA. If the Super Rewards Defendants fail to adequately respond to Plaintiff's demand within thirty (30) days from the date the notice is served, Plaintiff will amend this complaint to seek actual and punitive damages from the Super Rewards Defendants according to the CLRA.

67. By the filing of this Complaint, Plaintiff seeks an order enjoining the unlawful practices described herein and an Order requiring Defendants to notify the Class of their violations of the CLRA and the remedy they will provide to them. Plaintiff and the Class are entitled to equitable relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits obtained by Defendants as a result of their violations of the CLRA, along with other appropriate relief including reasonable attorneys' fees and expenses.

### THIRD CLAIM FOR RELIEF
### [Unjust Enrichment]

68. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

69. Defendants have benefited and been enriched by the above-alleged conduct. Defendants have collected fees and generated revenue from the unlawful conduct described above.

-17-

70. Defendants have knowledge of this benefit.

71. Defendants have voluntarily accepted and retain this benefit.

72. The circumstances, as described herein are such that it would be inequitable for Defendants to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the Class.

73. Plaintiff and the Class are entitled to the amount of Defendants' ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair and inequitable conduct as alleged herein. Plaintiff and the Class may make claims on a pro rata basis for restitution.

74. Accordingly, and in addition, Plaintiff seeks the imposition of a constructive trust on those monies by which the Defendants have been unjustly enriched as a result of the unlawful practices described herein.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief:

1. For an order certifying that this action may be maintained as a class action against Defendants, appointing Plaintiff and her counsel to represent the Class and directing that reasonable notice of this action be given by Defendants to the Class;

2. For restitution and disgorgement, according to proof, including prejudgment interest as allowed by law;

3. That pursuant to sections 17203 and 17204 of the Business and Professions Code, Defendants be permanently enjoined from performing or proposing to perform any of the aforementioned acts of unfair and deceptive business practices;

4. That pursuant to section 17206 of the Business & Professions Code, section 1021.5 of the Code of Civil Procedure, and the Court's inherent equitable power, Plaintiff recover her costs, including costs of suit, and reasonable attorneys' fees;

5. That Plaintiff and the Class recover actual and punitive damages from Defendant Zynga pursuant to the CLRA; and

6. That Plaintiff be entitled to such other and further relief as this Court may deem just and proper.

# JURY DEMAND

To the full extent available, Plaintiff demands a trial by jury.

Dated: February 10, 2010     **KERSHAW, CUTTER & RATINOFF**


By   */s/ Stuart C. Talley*
      STUART C. TALLEY

William A. Kershaw
C. Brooks Cutter
John R. Parker, Jr.
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Mark J. Tamblyn
Ian J. Barlow
**WEXLER WALLACE LLP**
455 Capitol Mall, Suite 231
Sacramento, California 95814
Telephone: (916) 492-1100
Facsimile: (916) 492-1124

Attorneys for Plaintiff

## **DECLARATION OF STUART C. TALLEY PURSUANT TO CIVIL CODE § 1780(c)**

I, STUART C. TALLEY, declare as follows:

    1.    I am an attorney at law duly licensed to practice before all courts of the State of California, and am a partner in the firm of Kershaw, Cutter & Ratinoff, counsel of record for Plaintiff. I have personal knowledge of the matters set forth below and if called as a witness could and would competently testify thereto.

    2.    I am informed and believe that venue is proper in this court under Civil Code § 1780(c) based on the following facts:

    (a)    Defendants have performed transactions at issue in this action, or have obtained financial benefit from such transactions, at all times relevant to this action, in the Northern District of California;

    (b)    At all relevant times herein, Plaintiff resided in the Northern District of California.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration was executed on February 10, 2010 in Sacramento, California.

                                    */s/ Stuart C. Talley*
                                    STUART C. TALLEY