Richard L. Seabolt (SBN 67469)
Suzanne R. Fogarty (SBN 154319)
Oliver E. Benn (SBN 244618)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
Telephone: 415.957.3000
Facsimile:  415.957.3001
E-mail:     RLSeabolt@DuaneMorris.com
            SRFogarty@DuaneMorris.com
            OBenn@DuaneMorris.com

Attorneys for Defendant,
ZYNGA GAME NETWORK, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA SWIFT, individually, on behalf of the general public, and all others similarly situated,<br><br>               Plaintiff,<br><br>       v.<br><br>ZYNGA GAME NETWORK, INC.;<br>ADKNOWLEDGE, INC.; D/B/A SUPER REWARDS; KITN MEDIA USA, INC., D/B/A SUPER REWARDS;<br><br>               Defendants. | Case No.: CV 09-5443 SBA<br><br>**DEFENDANT ZYNGA GAME NETWORK, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; CERTIFICATION OF COMPLIANCE WITH STANDING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     June 29, 2010<br>Time:    1:00 p.m.<br>Judge:   Hon. Saundra B. Armstrong<br>Ctrm.:   1<br><br>Complaint Filed:    November 17, 2009 |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT ..............1

CERTIFICATION OF COMPLIANCE WITH STANDING ORDER ................................1

MEMORANDUM OF POINTS AND AUTHORITIES........................................................2

I.   INTRODUCTION............................................................................................................2

II.  FACTUAL ALLEGATIONS OF THE COMPLAINT ................................................3

III. SPECIAL STANDARD ON MOTION TO DISMISS WHEN CDA DEFENSE RAISED.........5

IV. ARGUMENT ...................................................................................................................6

   A.  Plaintiff's Claims Are Barred by the Communications Decency Act of 1996...........................6

     1.   Congress Changed the Common Law, Providing Immunity for Internet Companies Against Claims Based on the Content of Third Parties. .......................................................7

     2.   Courts Have Uniformly Interpreted the CDA to Provide Broad Immunity...........................9

     3.   Zynga Falls Squarely Within The Immunity Required by Section 230 Because Plaintiff's Claims All Derive From Content Provided by Third Parties. ............................................10

     4.   Goddard v. Google, Inc. Is Directly On Point and Requires Dismissal................................19

   B.  The Complaint Sounds in Fraud But Is Not Pled With Particularity. .......................................22

V.  CONCLUSION .............................................................................................................25

Zynga - Motion to Dismiss First Amended Complaint
CV 09-5443 SBA

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal,* __ U.S. __, 129 S.Ct. 1937 (2009)....................................................7, 15, 18-20

*Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009) ............................................................10, 13-15

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ...................................... 7, 9, 11-12, 16-18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................................7, 21

*Ben Ezra, Weinstein, & Co., Inc. v. America Online Inc.,* 206 F.3d 980 (10th Cir. 2000) .......9, 11

*Blumenthal v. Drudge*, 992 F.Supp. 44 (D.D.C. 1998) ...............................................11, 16-18, 23

*Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir. 1992)..............................13

*Carafano v. Metrosplash*, 339 F.3d 1119 (9th Cir. 2003) ................................. 7, 11-12, 16, 21-22

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994)...............................................6

*Dimeo v. Max*, 433 F.Supp.2d 523 (E.D. Pa. 2006) ....................................................................11

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ...........................................................11, 13

*Fair Housing Council of San Fernando Valley v. Roommate.com, LLC,*
521 F.3d 1157 (9th Cir. 2008) ...............................................3, 7, 9-10, 13-14, 16, 18-19, 21-22

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (E.D. Pa. 2007)..................................................23

*Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D.Cal. 2008)................................... 16-18, 20-23

*Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D.Cal. 2009)......4, 7-8, 10-11, 14-16, 18, 20-23

*Green v. America Online*, 318 F.3d 465 (3d Cir. 2003) ...............................................................11

*Grillo v. State of Cal.*, 2006 WL 335340 (N.D.Cal. 2006) ..........................................................5

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) .............................................15, 24-26

*Liveuniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852 (C.D.Cal. 2007) ....................................10

*Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009) ...........................................................7

*Nemet Chevrolet, Ltd. v. ConsumerAffairs.com*, 591 F.3d 250 (4th Cir. 2009) ......... 7-8, 11, 18-20

*Noah v. AOL Time Warner, Inc.*, 261 F.Supp.2d 532 (E.D. Va. 2003)........................................11

*Parker v. Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006) ....................................................11

ii

*Perfect 10, Inc. v. CCBill, LLC*, 340 F.Supp.2d 1077 (C.D.Cal 2004) .........................................11

*Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530 (9th Cir. 1984) ...................................6

*Rosal v. First Federal Bank of Calif.*, __ F.Supp.2d __,
    2009 WL 2136777 (N.D.Cal. 2009)............................................................................25

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)................................................5-6

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)..............................................24-26

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ...................................9-11, 14, 18

**State Cases**

*Austin v. CrystalTech Web Hosting*, 125 P.3d 389 (Ariz. Ct. App. 2005) ...................................11

*Barrett v. Rosenthal*, 40 Cal.4th 33 (2006)...................................................................9-11

*Colapinto v. County of Riverside*, 230 Cal.App.3d 147 (1991).....................................................5

*Delfino v. Agilent Technologies, Inc.*, 145 Cal.App.4th 790 (2006) ............................................12

*Doe II v. MySpace Inc.*, 175 Cal.App.4th 561 (2009) .........................................................9-11

*Doe v. AOL*, 783 So. 2d 1010 (Fla. 2001) ........................................................................11

*Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951 (1997) ...............................................25

*Gentry v. Ebay*, 99 Cal.App.4th 816 (2002)................................................................11, 17-18, 23

*Lauriedale Associates, Ltd. v. Wilson*, 7 Cal.App.4th 1439 (1992) .............................................25

*McBride v. Boughton*, 123 Cal.App.4th 379 (2004)..................................................................25

*Melchior v. New Line Productions, Inc.*, 106 Cal.App.4th 779 (2003).........................................25

*Phan v. Pham*, __ Cal.App.4th __, 2010 WL 658244 (2010) ..............................................9

*Schneider v. Amazon.com, Inc.* 108 Wash.App. 454 (2001) .......................................................12

*State ex rel. Metz v. CCC Information Services, Inc.*, 149 Cal.App.4th 402 (2007)......................5

**Federal Statutes and Rules of Court**

47 U.S.C. § 230(b)...................................................................................................9

47 U.S.C. § 230(b)(1)-(2) .......................................................................................12

47 U.S.C. § 230(b)(2)................................................................................................9

Zynga - Motion to Dismiss First Amended Complaint
CV 09-5443 SBA

47 U.S.C. § 230(c)(1) ................................................... 3, 7-9, 10, 12-15, 19, 21, 23

47 U.S.C. § 230(e)(3) ................................................................................. 9, 10

47 U.S.C. § 230(f)(2) ................................................................................ 12, 16

47 U.S.C. § 230(f)(3) ...................................................................................... 16

47 U.S.C. § 941(e)(1) ...................................................................................... 11

FRCP 9(b)............................................................................................... 15, 24

FRCP 11(b)(3) ............................................................................................... 15

**State Statutes**

Calif. Bus. & Prof. C. § 17200. ...........................................................6, 24-25

Calif. Civ. C. § 1750. ...........................................................................6, 24-25

**Other Authorities**

H.R. Rep. No. 107-449 (2002) ......................................................................... 11

1   **NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**

2   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that on June 29, 2010, at 1:00 p.m., or as soon thereafter as the

4   matter may be heard, in the courtroom of the Honorable Saundra Brown Armstrong, Defendant

5   Zynga Game Network, Inc. ("Zynga") will move the court for an order dismissing Plaintiff Rebecca

6   Swift's First Amended Complaint pursuant to the Federal Rule of Civil Procedure 12(b)(6).

7       After Zynga moved to dismiss the original Complaint for failure to allege specific facts that

8   Zynga had "created or developed" the offending content of the ads about which Plaintiff complains,

9   Plaintiff chose to amend to attempt to cure the deficiencies.  Plaintiff dismissed Facebook and added

10  Super Rewards, incrementally moving towards the creators and developers of the offending ads.  But

11  Plaintiff has simply inserted factually devoid conclusory allegations that "Defendants created or

12  developed" the offending ads without specifying what, if anything, Zynga did to create the offending

13  content.  Plaintiff has declined Zynga's offer to stipulate to allow Plaintiff to cure the deficiencies,

14  which confirms that further leave to amend would be futile.

15      This motion is based on this Notice of Motion and Motion, the supporting Memorandum, the

16  Request for Judicial Notice, all pleadings in this action, and the argument of counsel.

17  Dated:  March 1, 2010             DUANE MORRIS LLP

18                 By:              /s/

19                          Richard L. Seabolt
                        Attorneys for Defendant,
                        ZYNGA GAME NETWORK, INC.

20

21  **CERTIFICATION OF COMPLIANCE WITH STANDING ORDER**

22      I certify that on February 26, 2010, I met and conferred by telephone with J.R. Parker,

23  counsel for Plaintiff Rebecca Swift. We discussed the arguments that Zynga intended to make in this

24  Motion to Dismiss, including the conclusory nature of the allegations and failure to specify what was

25  allegedly done by Zynga, as opposed to "Defendants," an obviously ambiguous, generic term.

26      I also offered to stipulate to allow Plaintiff to amend further to attempt to specify what

27  Zynga allegedly did to create or develop the content of the advertising about which Plaintiff

28

1

complains. Mr. Parker did not accept my offer, which confirms that any further leave to amend would be futile.

Dated: March 1, 2010                    DUANE MORRIS LLP

                                        By:        /s/
                                                Richard L. Seabolt
                                                Attorneys for Defendant,
                                                ZYNGA GAME NETWORK, INC.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

Plaintiff Rebecca Swift has amended her original complaint in an attempt to plead around Section 230 of the Communications Decency Act of 1996 (the "CDA"). 47 U.S.C. § 230(c)(1). Over the course of eight pages, she repeats the same legal conclusion fifteen (15) times – that Zynga "created and developed" the third-party advertising that caused Swift's alleged harm. Swift does this to try to overcome the immunity that Congress provided to Internet companies in the CDA. But she offers no *facts* to support this allegation. Swift repeatedly alleges that Zynga was part of a fraudulent scheme to mislead users, but fails to identify any facts that would allow the Court to conclude that Zynga "created or developed" the third-party advertising content at issue.

As Zynga explained in its motion to dismiss the original complaint, Congress changed the common law to provide broad immunity to Internet companies for claims arising from the publication or distribution of third-party content. Congress made the policy determination that the Internet should develop based on self-regulation and the power of market forces, rather than having its growth retarded by the crippling costs of litigation. *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008). Aggrieved parties can pursue the content's originators, but not the platforms that host that content. Apparently unaware of the CDA, Swift's original complaint sought to hold Zynga liable for, in her words, having "published," "promulgated" or "made available to users" the allegedly misleading content of third-party advertisers. This is the classic type of conduct for which the CDA immunizes Internet companies.

By contrast, the CDA does not provide the same protection if the defendant itself "created or developed" the offending content. Therefore, Swift has replaced the words "published," "made

2

available to users" and "promulgated" with the conclusory CDA buzzwords "created and developed" in her Amended Complaint. She uses that phrase over and over again. But despite using new legal terminology, the allegations' substance is unchanged. Swift has still not alleged any *facts* to show how Zynga created or developed the third-party advertising that caused her alleged harm.

Judge Fogel of this Court recently addressed a very similar set of class allegations made against Google based on third-party advertising appearing on Google's advertising platform. *Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D.Cal. 2009). Judge Fogel held that, no matter how "artful [the] pleading" in its attempts to avoid CDA immunity, the claims must fail when they seek to hold providers of online services liable for content created or developed by third parties.

Swift's claims also fail because they are grounded in fraud but not pled with particularity. The allegations insinuate that Zynga conspired in the allegedly misleading conduct of third-party advertisers. But the complaint does not identify any of the "who, what, when, where, and how" that the Ninth Circuit requires for allegations of fraud. Plaintiff's claims are all unsupported – and unsupportable – legal conclusions.

## II.     FACTUAL ALLEGATIONS OF THE COMPLAINT

Zynga develops games that members of social networking websites such as Facebook and MySpace can play on those websites. Complaint, ¶ 1. Examples of these interactive online games are FarmVille, where players compete with friends online to build the best virtual farms, and YoVille, a virtual world where players create their own characters, make friends, and acquire virtual goods. *See* ¶¶ 1, 12. According to the Complaint, more than 40 million individuals in the U.S. are active players of Zynga's games. ¶ 31.

All of Zynga's games are free to play. ¶¶ 2, 32. Swift explains that "Zynga's games allow users to collect virtual currency that can be used throughout the game to purchase virtual items or unlock options that make the games more enjoyable." ¶ 32. Players can earn virtual currency and progress through the games by performing tasks within the games themselves. ¶¶ 4, 32. As Swift makes clear, "[t]here is no cost to users who want to play Zynga's games." ¶ 32.

In addition to earning virtual currency by performing tasks in the game, players can, if they choose, obtain currency in two other ways. ¶¶ 2, 32. They can buy virtual currency from Zynga, or

they can receive currency from third-party advertisers by completing their advertising offers.  ¶ 32.
Zynga does not create or develop the third-party ads;[1] instead, Zynga has created a *platform* where
third-party advertisers can post their own advertising content.  *See* ¶ 8 (Zynga "create[d] and
develop[ed] the interfaces within Zynga's games that allow Zynga game users to select a 'special
offer' in exchange for virtual currency.")  Swift previously described this conduct slightly
differently, and more accurately – that Zynga simply "published", "promulgated" or "made available
to users" the third-party ads.  Orig. Compl., at ¶¶ 2, 6, 10.

Swift alleges that two *third-party ads* were misleading and that she was misled *by third-party*
*advertisers* into paying for offers she did not want, on two separate occasions.  ¶¶ 37-40.

First, Swift alleges that in approximately April, 2009, she provided her cell phone number to
a third-party advertiser because she wanted to earn points for one of Zynga's games, YoVille.  ¶ 37.
Swift does not attach a copy of the ad, describe its contents, explain her understanding of the ad,
describe what she understood the third-party advertiser would do with her cell phone number, or
describe how she thought she was earning points by doing what she did.  *See,* ¶ 37.  She claims that
"Defendants' misleading implementation" of the advertising was a "substantial factor" in her
decision to complete the "transaction."  ¶ 37.  But she does not explain the "misleading
implementation," or what "transaction" she completed.  Nonetheless, she alleges that $9.99 charges
appeared without her consent on her April cell phone bill, and then – again – three times
subsequently.  ¶ 37.  Plaintiff does not claim that she tried contacting her cell phone company, the
third-party advertiser, or anyone else (including Zynga and Super Rewards, the parties she is now
suing) to reverse these charges.  *See,* ¶ 37; *cf.* ¶ 40.

Second, in June 2009, Swift then alleges that she provided her debit card number to another
third-party advertiser to receive more points in YoVille.  ¶ 38.  She alleges that her bank account was
debited $165.85 by the third-party advertiser without her consent.  ¶ 40.  Swift alleges that she made

---

[1] Plaintiff has invented the term "Integrated Special Offer Transactions" or "ISOTs" to describe these offers, apparently for CDA purposes.  As this term has never been used outside the confines of the First Amended Complaint, and a Google search yields zero results for this phrase, Zynga will refer to these offers by the more common term, "third-party advertising."

4

"repeated efforts" to obtain a refund, but does not describe who she contacted or tried to contact, or when and how any such "efforts" were made.  *Id.*  Swift does not allege that she made any attempt to contact Zynga before she sent the statutory notice letter necessary to seek damages under the Consumer Legal Remedies Act, the day before filing her lawsuit.  *See,* ¶¶ 39-40, 66.

Swift points out that – before this lawsuit was ever filed – Zynga briefly removed all advertising until it had "weeded out" the allegedly deceptive third-party advertisers, which it has now done.  ¶ 18; *see also* Orig. Compl., at ¶ 6 (advertising already suspended prior to lawsuit being filed).  As will be discussed, this is exactly the reason Congress enacted the CDA, to encourage self-regulation on the Internet governed by market forces, not crippling lawsuits.  *See* p. 8, *infra.*

Plaintiff seeks to bring causes of action on her own behalf, and as a class representative, for unjust enrichment and for violations of California's Unfair Competition Law (Calif. Bus. & Prof. C. §§ 17200 et seq. ("UCL")) and the Consumer Legal Remedies Act (Calif. Civ. C. §§ 1750 et seq. ("CLRA")).  Plaintiff seeks to represent all U.S. residents who earned virtual currency by responding to an "integrated special offer transaction" and who were "charged money as a result."  FAC ¶ 42.  The proposed class definition does not distinguish between users who were charged consensually, and those charged wrongfully.  *Id.*

## III.  SPECIAL STANDARD ON MOTION TO DISMISS WHEN CDA DEFENSE RAISED

A complaint may be dismissed for failure to state a claim upon which relief may be granted for one of two reasons: (1) lack of a cognizable legal theory; or, (2) insufficient facts under a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984).  All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party.  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).  "The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Moreover, allegations that merely state legal conclusions, even if couched in factual terms, "are not entitled to an assumption of truth."  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1951 (2009) ("*Iqbal*")).  Even under liberal pleadings standards, a complaint must do more than "plead[] facts that are 'merely consistent with' a

5

1  defendant's liability." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. 544, 557 (2007));

2  *Moss*, 572 F.3d at 969. Instead, the plaintiff must set forth enough factual information to make it

3  "plausible" rather than just "possible" that the defendant is liable. *Id.*

4      In cases where, as here, the defendant moves to dismiss based on Section 230 of the CDA, a

5  "special" standard applies, and any doubts as to the "zone of CDA immunity" must be resolved in

6  favor of immunity, and the motion should be granted. *Goddard v. Google, Inc.*, 640 F.Supp.2d

7  1193, 1202 (N.D.Cal. 2009) (citing *Fair Housing Council of San Fernando Valley v.*

8  *Roommate.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008).) As this Court recently stated:

9      [There is] a special form of "prejudice" to defendants who improperly are denied
10     early dismissal of claims falling within the zone of CDA immunity . . . [b]ecause the
       CDA "must be interpreted to protect websites not merely from ultimate liability, but
11     from having to fight costly and protracted legal battles."

12  *Id.* (quoting *Roommate.com*, at 521 F.3d at 1174, 1175); Accordingly, Swift's claims against Zynga

13  should be dismissed at the earliest possible time based on the immunity provided by the CDA.

**IV.    ARGUMENT**

14

15  **A.    Plaintiff's Claims Are Barred by the Communications Decency Act of 1996.**

16      Swift seeks to hold Zynga liable for the allegedly misleading content of third-party

17  advertisers. As such, her claims are barred by the Communications Decency Act of 1996 (the

18  "CDA"). Section 230 of the CDA immunizes Internet companies against claims seeking to hold

19  them liable for content provided by third parties. 47 U.S.C. § 230(c)(1). Immunity extends to any

20  causes of action based on the decisions of a provider of an "interactive computer service," like

21  Zynga, regarding the selection, posting, distribution, and deletion of third-party content. *Id.*;

22  *Carafano v. Metrosplash*, 339 F.3d 1119, 1124-25 (9th Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018,

23  1031-1032 (9th Cir. 2003). This Court recently dismissed a class action complaint with very similar

24  allegations, applying CDA immunity to prevent Google being held liable for the content of third-

25  party advertisers that appeared on Google's advertising platform. *Goddard v. Google, Inc.*, 640

26  F.Supp.2d 1193, 1197-1201 (N.D.Cal. 2009) ("*Goddard II*").

27      All of Swift's claims are based on content created or developed by third-party advertisers,

28  not Zynga. As Judge Fogel held in *Goddard II*, no matter how "artful [the] pleading" in its attempts

6

to avoid the immunity of CDA section 230, the claims must fail when they seek to hold providers of online services liable for content created or developed by others. *Id.* at 1195. Fifteen times in eight pages, Swift uses the conclusory CDA terminology "created and developed" to try to plead around the CDA. But she does not allege any *facts* that would allow the Court to reach the same conclusion. Swift merely alleges that Zynga developed a host platform on which all third parties could post ads. Swift then ambiguously and repeatedly concludes that "Defendants" "created and developed" the ads, without offering any factual allegations to identify anything that Zynga did to create or develop either of the two third-party ads at issue (or any other ad). For this reason, Swift cannot state a claim upon which relief can be granted under any of her causes of action. *See, Nemet Chevrolet, Ltd. v. ConsumerAffairs.com*, 591 F.3d 250, 257 (4th Cir. 2009) (affirming dismissal based on CDA immunity where complaint failed to allege how website "contributed to the allegedly fraudulent nature of the [third party] comments at issue").

### 1.     Congress Changed the Common Law, Providing Immunity for Internet Companies Against Claims Based on the Content of Third Parties.

In 1996, Congress enacted Section 230(c)(1) of the CDA, which provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

Congress explained that one of the reasons for passing this immunity provision was to foster the development of the Internet in an environment "unfettered" by government regulation. Subsection (b) of Section 230 provides:

It is the policy of the United States -

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation . . .

47 U.S.C. § 230(b); *see also Batzel*, 333 F.3d at 1027 ("Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce.") The immunity provided by Section 230 preempts all inconsistent state causes of action. 47 U.S.C. § 230(e)(3); *Gentry v. eBay*, 99 Cal.App.4th 816, 830-34 (2002).

7

1   Starting from the first, seminal appellate opinion interpreting Section 230, *Zeran v. America*

2   *Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), through to the most recent cases analyzing the

3   statute, courts have repeatedly and unequivocally reached the same conclusion – that Congress

4   intended to provide "broad immunity" to websites for civil liability based on content supplied by

5   third parties. *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*

6   ("*Roommate.com*"), 521 F.3d 1157, 1175 (9th Cir. 2008) (the CDA "must be interpreted to protect

7   websites not merely from ultimate liability, but from having to fight costly and protracted legal

8   battles"); *see also Phan v. Pham*, __ Cal.App.4th __, 2010 WL 658244, *2 (2010) ("section

9   230(c)(1) immunity was intended to prevent liability that otherwise would obtain under traditional

10  common law."); *Doe II v. MySpace Inc.*, 175 Cal.App.4th 561, 568 (2009) ("the legislative history

11  demonstrates Congress intended to extend immunity to all civil claims.").

12      One of the main reasons for this expansive immunity is that Congress wanted the Internet to

13  develop in an atmosphere where market forces rather than government heavy-handedness and

14  aggressive litigation would retard its growth.  47 U.S.C. § 230(b)(2); *Roommate.com*, 521 F.3d at

15  1175.  This was true both for websites that sought to filter content and those that did nothing at all.

16  "Congress contemplated self-regulation, rather than regulation compelled at the sword point of tort

17  liability . . .  [T]he immunity conferred by section 230 applies even when self-regulation is

18  unsuccessful, or completely unattempted." *Barrett v. Rosenthal*, 40 Cal.4th 33, 53 (2006).

19      Simply stated, Congress recognized that it would be more effective for the "millions of

20  users" of a website to vote with their feet – by going to other websites – rather than by filing

21  lawsuits. *Doe II*, 175 Cal.App.4th at 569; *see generally, Liveuniverse, Inc. v. MySpace, Inc.*, 2007

22  WL 6865852 at *10 (C.D.Cal. 2007) (discussing how market forces and rapid technological changes

23  impact traditional legal doctrines).  This would more effectively curb questionable conduct, and

24  foster the development of the Internet, than litigation. *Goddard II,* 640 F.Supp.2d at 1202.

25      As illustrated by the substantial volume of CDA cases cited in the section immediately

26  below, otherwise meritorious claims against interactive computer services like Zynga are preempted.

27  47 U.S.C. §§ 230(c)(1), 230(e)(3); *see also, Barnes v. Yahoo!*, 570 F.3d 1096, 1101 (9th Cir. 2009)

28  (citing negligent publication of advertising as example of common law cause of action preempted

8

and for which CDA immunity would apply); *Goddard II*, 640 F.Supp.2d at 1197-1201 (Google immune even if it provided tools that furthered fraudulent third-party advertising). Congress made the policy choice for self-regulation rather than protracted litigation. *Roommate.com*, 521 F.3d at 1175; *Barrett*, 40 Cal.4th at 53.

And the type of self-regulation that Congress contemplated is *exactly* what has occurred in this case. Zynga responded – even according to Swift – to reports by certain "media outlets" about the quality of some third-party advertisements by voluntarily suspending third-party advertising on its platform until it had "weeded out" the bad apples. ¶¶ 17, 18. Having engaged in that voluntary, self-regulatory effort, third-party ads now appear again on Zynga's service. ¶ 18. This is the entire point of the CDA, and the reason for immunity is provided. "Congress contemplated self-regulation, rather than regulation compelled at the sword point of tort liability." *Barrett*, 40 Cal.4th at 53.

Swift's causes of action *against Zynga* are barred. This does not mean she is left without recourse. *Zeran*, 129 F.3d at 331 ("None of this means, of course, that the original culpable party who posts [the harmful content] would escape accountability"). But she must pursue the originator of the content, rather than the intermediary.

### 2.   Courts Have Uniformly Interpreted the CDA to Provide Broad Immunity.

Consistent with the Congressional intent,[2] courts have consistently held that Section 230 provides broad immunity for all causes of action that would seek to hold an interactive computer service liable for content created or developed by a third party. *Goddard II*, 640 F.Supp.2d at 1197-

---

[2] Six years after passing the CDA, Congress confirmed the courts had correctly interpreted its intent with respect to immunity. In 2002, when Congress passed the "Dot Kids Implementation and Efficiency Act," it specifically extended the protections of Section 230 to cover certain entities that would operate in the new child-friendly "kids.us" sub-domain. 47 U.S.C. § 941(e)(1). Citing several of the opinions noted in this section, the definitive committee report accompanying the new statute stated that "courts have correctly interpreted section 230(c)," and that "[t]he Committee intends these interpretations of Section 230(c) to be equally applicable to those entities covered by [the new statute]." H.R. Rep. No. 107-449, at 13 (2002) (citing *Zeran*, 129 F.3d 327; *Ben Ezra*, 206 F.3d 980; *Doe v. AOL*, 783 So. 2d 1010 (Fla. 2001). The more recent cases cited in this brief have heavily relied on those earlier cases and have adopted their interpretation of the CDA. *See, e.g. Batzel*, 333 F.3d at 1027-1030 (frequently citing *Zeran*, and also citing *Ben Ezra*, in its interpretation of CDA); *Nemet*, 591 F.3d at 253-254 (frequently citing *Zeran*).

9

1201 (fraud, breach of contract, negligence, and other statutory and common law violations); *Perfect 10, Inc. v. CCBill, LLC*, 340 F.Supp.2d 1077, 1110 (C.D.Cal 2004), aff'd *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (causes of action for violation of UCL and other consumer protection statutes); *Gentry*, 99 Cal.App.4th at 830-34 (same, and also negligent misrepresentation); *see also*, *Nemet Chevrolet*, 591 F.3d 250 (tortious interference with business expectancy); *Carafano*, 339 F.3d at 1125 (negligence); *Batzel*, 333 F.3d at 1031-1032 (defamation); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (negligence); *Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003) (negligence and contract claims); *Ben Ezra*, 206 F.3d at 986; *Zeran*, 129 F.3d at 330 (negligence); *Parker v. Google, Inc.*, 422 F.Supp.2d 492, 501 (E.D. Pa. 2006) (defamation, invasion of privacy, and negligence liability); *Noah v. AOL Time Warner, Inc.* (E.D. Va. 2003) 261 F.Supp.2d 532, 538, aff'd, 2004 WL 602711 (4th Cir. 2004) (negligence and defamation); *Blumenthal v. Drudge*, 992 F.Supp. 44, 49-52 (D.D.C. 1998) (defamation); *Barrett v. Rosenthal*, 40 Cal.4th at 40 (same); *Doe II*, 175 Cal.App.4th at 566 (negligence); *Doe v. AOL*, 783 So.2d 1010, 1013-1017 (Fla. 2001) (same); *Schneider v. Amazon.com, Inc.* 108 Wash.App. 454, 461-463 (2001) (negligent misrepresentation, tortious interference, and breach of contract).

### 3.   Zynga Falls Squarely Within The Immunity Required by Section 230 Because Plaintiff's Claims All Derive From Content Provided by Third Parties.

A defendant is immune from liability under Section 230 if: (1) it is "a provider or user of an interactive computer service;" (2) the plaintiff seeks to treat the defendant as a publisher or speaker; and, (3) the content at issue is "information provided by another information content provider." 47 U.S.C. § 230(c)(1); *Carafano*, 339 F.3d at 1123.  Zynga falls directly within the statutory immunity.

#### a.   Zynga Is a Provider of an Interactive Computer Service as Defined by the CDA.

Zynga is without doubt a "provider . . . of an interactive computer service."  47 U.S.C. § 230(c)(1).  The CDA defines "interactive computer service" as:

> any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(f)(2).

10

This term has been given an expansive reading. "Courts have broadly interpreted the term 'interactive computer service' under the CDA." *Delfino v. Agilent Technologies, Inc.*, 145 Cal.App.4th 790, 805 (2006). The term "includes a wide range of cyberspace services." *Batzel*, 333 F.3d at 1030, fn. 15; *see also Delfino*, 145 Cal.App.4th at 805 (citing Ninth Circuit and other federal and state courts finding immunity for wide range of Internet services including an auction website; a library; an online dating service; a non-profit website and listserv; an electronic bulletin board operator; a search engine; a computer rental company; and, an online retailer.) This expansive interpretation is consistent with Congress' intent to allow the Internet to develop without unnecessary, rigid government regulation. 47 U.S.C. §§ 230(b)(1)-(2).

Even without these judicial interpretations, Zynga easily fits within the plain meaning of a "provider or user of an interactive computer service." Zynga provides interactive games to users of social networking platforms such as Facebook and MySpace. Complaint, ¶¶ 1, 12, 31. In Swift's words, Zynga "provid[es] a network of on-line games that can be played by subscribers of networking sites such as Facebook and MySpace." *Id.* at ¶ 31. Therefore, Zynga literally provides interactive computer services to users such as Swift.

> **b.    Plaintiff's Causes of Action Treat Zynga as a Publisher or Speaker.**

Under the Ninth Circuit's interpretation of the CDA, Swift's causes of action seek to treat Zynga as the "publisher or speaker" of third party content. 47 U.S.C. § 230(c)(1); *Barnes v. Yahoo!*, 570 F.3d 1096, 1101-1102 (9th Cir. 2009). This is because Swift wishes to hold Zynga liable for allowing third parties to place content within Zynga's interactive computer service. Swift's original complaint specifically alleged that Zynga was responsible because it "made available to users", "promulgated" or "published" third party ads. Orig. Compl. at ¶¶ 2, 6, 10.[3] While Swift's amended

---

[3] "A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint." *State ex rel. Metz v. CCC Information Services, Inc.*, 149 Cal.App.4th 402, 412 (2007); *see also, Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice"); *Grillo v. State of Cal.*, 2006 WL 335340 at *6 (N.D.Cal. 2006) (Armstrong, J.) (same); *Colapinto v. County of Riverside*, 230 Cal.App.3d 147, 151 (1991) (same).

11

1  complaint now omits these words, the substance of the allegations remains the same, and the CDA

2  immunizes interactive computer services against all such claims.

3     In *Barnes v. Yahoo!*, the Ninth Circuit recently discussed how the label placed on a cause of

4  action does not matter for CDA purposes – what matters is the type of activity by the website that

5  allegedly caused the Plaintiff's harm.  570 F.3d at 1101-1102.  Because the words "publisher or

6  speaker" appear in the CDA, defamation has been the "cause of action most frequently associated

7  with" Section 230 immunity.  *Id.* at 1101.  The Ninth Circuit noted, however, that there were many

8  causes of action, including advertising-related claims, where liability would be premised on

9  publishing activities and the CDA would provide immunity.  As the Court observed:

10     [T]he language of the statute does not limit its application to defamation cases. Indeed,
11     many causes of action might be premised on the publication or speaking of what one
        might call "information content." A provider of information services might get sued for
        violating anti-discrimination laws, *see, e.g., Roommates, 521 F.3d 1157*; for fraud,
12     negligent misrepresentation, and ordinary negligence, *see, e.g., Doe v. MySpace, Inc.*,
        528 F.3d 413 (5th Cir. 2008) . . . or even for negligent publication of advertisements
13     that cause harm to third parties, *see Braun v. Soldier of Fortune Magazine, Inc.*, 968
        F.2d 1110 (11th Cir. 1992). Thus, what matters is not the name of the cause of action –
14     defamation versus negligence versus intentional infliction of emotional distress – what
        matters is whether the cause of action inherently requires the court to treat the
15     defendant as the "publisher or speaker" of content provided by another.

16  *Id.* at 1101-1102.

17     The Court then cited to its prior decision in *Roommate.com* and to "common sense" to

18  understand the broad scope of conduct that would fall within CDA immunity:

19

20     We have indicated that publication involves reviewing, editing, and deciding whether
        to publish or to withdraw from publication third-party content. *See Roommates*, 521
21     F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to
        exclude material that third parties seek to post online is perforce immune under section
22     230."). We need not perform any intellectual gymnastics to arrive at this result, for it is
        rooted in the common sense and common definition of what a publisher does. One
23     dictionary defines "publisher," in relevant part, as "the reproducer of a work intended
        for public consumption" and also as "one whose business is publication." *See*
24     Webster's Third New International Dictionary 1837 (Philip Babcock Gove ed., 1986).
        Thus, a publisher reviews material submitted for publication, perhaps edits it for style
25     or technical fluency, and then decides whether to publish it. [footnote]. *See also Zeran*,
26     129 F.3d at 330 (listing "deciding whether to publish, withdraw, postpone or alter
        content" as examples of "a publisher's traditional editorial functions").

27  *Id.* at 1102 (emphasis added).

28
                                            12

Accordingly, under the CDA, causes of action that attempt to hold a website liable for decisions regarding whether to include or exclude third party content impermissibly treat the defendant as the publisher or speaker of that third party content. 47 U.S.C. § 230(c)(1); *Barnes*, 570 F.3d at 1102; *Roommate.com*, 521 F.3d at 1170-71. Both the Ninth Circuit and this Court have concluded that this applies with equal force to third party advertising content. *Barnes*, 570 F.3d at 1101 (citing negligent publication of advertising as example of cause of action seeking to treat entity as a "publisher"); *Goddard II*, 640 F.Supp.2d at 1195 (Google immune from claims seeking to hold it liable for allegedly providing tools that furthered fraudulent third-party advertising).

Swift now uses different terminology than in her original complaint, where she alleged that Zynga should be held liable because it "made available to users," "promulgated" or "published" third party ads. Orig. Compl. at ¶¶ 2, 6, 10. But she still complains that she was deceived by third-party advertising that appeared in Zynga's games. Swift asserts that Zynga creates and develops the social games themselves. FAC ¶ 1. Swift then alleges Zynga contracts with "offer aggregators" such as Defendants Adknowledge Inc., and KITN Media USA, Inc. in connection with the advertising offers. ¶¶ 7-8. Swift does not explain what an advertising aggregator does, but the plain meaning of these words indicates that these companies collect or pool together advertising offers from third parties. Swift then alleges that Zynga develops the interfaces within its games that allow these third-party ads to appear. ¶ 8. Two of the third-party ads that appeared on Zynga's advertising platform allegedly caused Swift to suffer monetary loss. ¶¶ 37-40. Swift then tries to go beyond these allegations with a substantial number of vague conclusions about how unidentified "Defendants" "created and developed" these ads.

But the only *factual* allegations are those discussed above, and they fall squarely within the types of "publishing" conduct for which the CDA provides immunity. Swift's factual allegations claim that Zynga facilitated the dissemination of others' content by creating a neutral platform and setting general parameters for *all* third parties who wished to display advertising content.[4] By

[4] Swift's allegation that "Historically, most, if not all" third-party ads were scams is the type of abusive unsupportable factual contention that Rule 11 is designed to deter. ¶ 33; FRCP 11(b)(3). To support her contention, Swift chooses to misquote Zynga's CEO, Mark Pincus, taking a quote from a blog posting without its context. Swift claims he said that there were not "any [ads] that

admitting that Zynga contracted with advertising aggregators to collect and pool ads, Swift is effectively conceding that these ads did not originate with Zynga, and that Zynga did not create or develop them. Even if Zynga specifically reviewed the two ads at issue, edited them and/or considered whether or not to post them (none of which Swift alleges), the claims still seek to treat Zynga as a "publisher or speaker." *Barnes*, 570 F.3d at 1101-1102; *Goddard II*, 640 F.Supp.2d at 1195. Congress has explicitly provided Internet companies with immunity against such claims.

### c.   Plaintiff Seeks to Hold Zynga Liable For the Content of Third Parties.

The consistent body of case law on Section 230 makes equally clear that Zynga cannot be held liable for "*any* information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Section 230 extends immunity to service providers in all situations in which they did not participate in the "creation or development" of the particular online content on which a plaintiff bases her claims. 47 U.S.C. § 230(f)(3); *Roommate.com*, 521 F.3d at 1167-69. Like Google's Adwords advertising service, Zynga offers a neutral set of tools for third-party advertisers to use to communicate with Zynga's users. *Goddard II*, 640 F.Supp.2d at 1196-1197 (citing *Roommate.com*, 521 F.3d at 1167-69). Plaintiffs are free to pursue the third-parties that actually caused the alleged harm, but the CDA immunizes providers that simply provide "neutral tools" for the dissemination of web content. *Id.* at 1196. While vaguely couched as a conspiracy, in reality Swift seeks to hold Zynga responsible for content created and developed by third-parties.

---

offer clear user value." ¶ 17. Swift fails to inform the Court that Pincus was referring to mobile subscription ads only. Req. for Jud. Ntc. Ex. A. In the same blog post he also stated most offers "are good for the advertiser and the user." *Id.* The unsupported nature of Swift's contention that "most, if not all" third-party ads were scams is highlighted by the fact that three months, two plaintiffs' law firms, one "investigation" and two complaints into this litigation, this case has only one plaintiff, who has only been able to identify two allegedly misleading ads. ¶¶ 37-41; *see also* http://www.kcrlegal.com/news/Unauthorized-charges-social-network-games.asp (Swift's counsel's November announcement of investigation into advertising in Zynga's games). Moreover, a claim that "most, if not all" of Zynga's advertising-based revenue came from scams, coupled with plaintiff's contention that Zynga allegedly knew about the scams, is a claim sounding in fraud. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). As discussed below, these conclusory allegations not only fall short of the standards for a well-pled complaint, *Iqbal*, 129 S.Ct. at 1949, 1953, but fall woefully short of the pleading with particularity required for claims sounding in fraud under FRCP 9(b). *Id.* at 1125. This allegation is entitled to no weight.

14

1    The CDA ensures that liability resides squarely with the party or parties responsible for the

2  "creation or development" of the content.  47 U.S.C. § 230(f)(2).  The term "creation or

3  development" means more than just "involvement."  *Goddard v. Google, Inc.*, 2008 WL 5245490, at

4  *3 (N.D.Cal. 2008) ("*Goddard I*") (citing *Roommate.com*, 521 F.3d at 1169 & n. 24, 1171, 1174 n.

5  37, 1175).  It requires more than just offering a "framework" within which third party providers can

6  insert their content.  *Carafano*, 339 F.3d at 1124-25; *Roommate.com*, 521 F.3d at 1169-1171.  It also

7  requires more than retaining a right to exercise editorial control, choosing what content does/does

8  not appear, or even actively promoting that content.  *Batzel*, 333 F.3d at 1031-1032; *Blumenthal v.*

9  *Drudge* ("*Drudge*") (D.D.C. 1998) 992 F.Supp. 44, 49-52.  Rather, a plaintiff must allege that the

10  website "materially contribute[d]" to the "alleged unlawfulness" of the content at issue, doing more

11  than just providing "neutral tools" for third parties to use.  *Roommate.com*, 521 F.3d at 1169 & n. 24.

12    Several cases illustrate the types of participation permitted by a website without removing

13  CDA immunity.  In those cases, the intermediaries were significantly more involved with the third-

14  party content than the allegations against Zynga.  In *Batzel*, the Ninth Circuit held that immunity

15  applied to the operator of a listserv and website, even though he had selected the content at issue for

16  dissemination to his audience and had affirmatively edited some of the injurious material before

17  distributing it.  333 F.3d at 1031.  Similarly, in *Drudge*, the district court held that AOL could not be

18  held liable for the content of a third-party news service it offered at the time (the Drudge Report),

19  even though AOL had contracted for the reports, retained extensive editorial rights as to their

20  content, and aggressively promoted the news service as an AOL feature.  992 F.Supp. at 49-52

21  (*accord, Batzel*, 333 F.3d at 1031 fn. 19).  Additionally, in *Gentry v. eBay*, 99 Cal.App.4th 816, 833-

22  834 (2002) ("*Gentry*"), the California Court of Appeal held eBay immune against claimed UCL and

23  other statutory and common law violations based on eBay's alleged shortcomings in allowing fake

24  autographed sports products to be advertised for sale on its auction site.  These included allegations

25  that eBay "gave customers a false sense of confidence" in certain third-party sellers by giving

26  automated endorsements based on volume of sales and positive user feedback.  *Id.* at 822.  The court

27  held that these claims did not remove CDA immunity because eBay "did not create or develop the

28  underlying misinformation."  *Id.* at 834 (*accord, Goddard I*, 2008 WL 5245490 at *3).

15

Swift makes similar allegations here.  She alleges she was harmed by deceptive offers made by third-party advertisers.  Complaint, ¶¶ 37-41.  While Swift half-heartedly alleges that Zynga "created and developed" the ad, in the same sentence she admits that it was actually the advertising content of a "business partner" that caused her harm.  ¶ 37.  By "business partner," she means the third-party advertiser who actually created and developed the ad and sold the product or service.  See ¶ 39 (describing the product seller as Zynga's "business partner").  Zynga is no more of a "business partner" to its third-party advertisers than eBay was to its merchants, or Google to its advertisers, or AOL to gossip columnist Matt Drudge.  Nonetheless, in those instances, the courts looked beyond the plaintiffs' conclusory labels and properly held that only the parties that actually created or developed the content could be held liable.  *Gentry*, 99 Cal.App.4th at 833-834; *Goddard I*, 2008 WL 5245490, at *3; *Drudge*, 992 F.Supp. at 52.  Swift's factual allegations, rather than her legal conclusions, make clear that she wishes to hold Zynga liable for allowing allegedly misleading third-party content to appear on its site.[5]  The CDA immunizes Internet companies against such claims.

CDA immunity applies equally to interactive computer services that derive a financial benefit from making available third party information.  "[T]he fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content."  *Goddard I*, 2008 WL 5245490, at *3 (citing *Roommate.com*, 521 F.3d at 1161, 1174-75, *Gentry*, 99 Cal.App.4th at 822, 828-31, and *Drudge*, 992 F.Supp. at 52).  Nor could it be otherwise.  The CDA is not limited to non-profits.  One of the main purposes of Section 230 was to "to promote the development of e-commerce."  *Batzel*, 333 F.3d at 1027.  Even though eBay receives a cut of each auction item sold on its website by third parties, and Google receives payment for each third-party ad click, the CDA extends immunity to them even when they do not filter out bad apples.  *Gentry*, 99 Cal.App.4th at 828-31; *Goddard II*, 640 F.Supp.2d at 1198.  Similarly, the fact that Swift alleges Zynga receives revenue as a result of third-party advertising (¶¶ 37, 41) does not take Zynga outside of the protections of Section 230.

---

[5] Indeed, Swift's original complaint sought to hold Zynga liable because it "promulgated", "made available to users," or "published," content created by third-parties.  Orig. Compl. at ¶¶ 2, 6, 10.

16

Moreover, the CDA immunizes an interactive computer service even if it knows that third parties are creating and posting illegal content and still do nothing to prevent it. *Roommate.com*, 521 F.3d at 1169, fn. 24; *Zeran*, 129 F.3d at 333; *Gentry*, 99 Cal.App.4th at 835; *Goddard I*, 2008 WL 5245490 at *3 ("even if a service provider knows that third parties are using such tools to create illegal content, the service's provider's failure to intervene is immunized"). The seminal case on the CDA explained that one of Section 230's main purposes was to avoid "liability upon notice," and instead to encourage self-regulation. *Zeran*, 129 F.3d at 333. As the Ninth Circuit has observed:

> [T]his is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content. [citation]. Websites are complicated enterprises, and **there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged — or at least tacitly assented to — the illegality of third parties** . . . [I]n cases of enhancement by implication or development by inference . . . section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Roommate.com*, 521 F.3d at 1174-1175 (bold emphasis added). Even if all of Plaintiff's allegations were true, and Zynga knew or should have known about offensive third-party conduct and did nothing, Section 230 would still bar her claims.

These conclusions are confirmed by a recent CDA case from the Fourth Circuit, *Nemet Chevrolet*, which cited extensively to both the *Iqbal* pleadings standard and the Ninth Circuit concerning the creation or development of content for CDA purposes. 591 F.3d 250. In that case, a car dealership brought claims for tortious interference with business expectancy and defamation against a website that allegedly posted consumer complaints but would also contact the authors to discuss ways to make their complaints attractive to class action law firms. *Id.* at 252, 256-257. The plaintiff attempted to avoid CDA section 230 by claiming that the defendant website participated in the creation or development of the content at issue by "contacting the consumer to ask questions about the complaint and to help her draft or revise her complaint, and promising the consumer that she could obtain some financial recovery by joining a class action lawsuit." *Id.* at 256.

17

1    The Fourth Circuit held such allegations insufficient to survive a motion to dismiss.  Citing

2 the Ninth Circuit's *Roommate.com* opinion, the court first observed that CDA immunity should be

3 resolved "at the earliest possible stage of the case" so that websites could avoid costly and protracted

4 litigation.  *Id.* at 255. (citing *Roommate.com*, 521 F.3d at 1175).  It further noted that under

5 *Roommate.com*, unless a website operator *required* offending content to be published, the website

6 operator would not be considered to have created or developed the content even if it helped draft or

7 revise the consumer's complaints.  *Id.* at 257.  Moreover, the court held that the plaintiff's

8 allegations were too vague under *Iqbal* to state a claim.  The allegations were "threadbare and

9 conclusory" and did not "'show or even intimate' that Consumeraffairs.com contributed to the

10 allegedly fraudulent nature of the comments at issue." *Id.* at 257-258 (quoting *Iqbal*, 129 S.Ct. at

11 1952).  The plaintiff had not identified what the website operator revised or drafted, or how doing so

12 made the content offensive.  *Id.*  Accordingly, the Fourth Circuit affirmed the district court's

13 dismissal for failure to state a claim.

14    Here, Swift's factual allegations do not identify any misrepresentations by Zynga with

15 respect to the ads at issue (or any other ads).  (¶¶ 1-21, 31-41.)  As already discussed, the harm Swift

16 purportedly suffered came as a result of the alleged misconduct of third-party advertisers, not Zynga.

17 *See*, ¶¶ 37-41.  Swift repeatedly claims that Zynga "created and developed" the advertising at issue.

18 But ultimately Swift concedes that it was the misrepresentations of third party advertisers (who she

19 disingenuously labels "business partners" of Zynga) that actually caused her alleged harm.  ¶¶ 37,

20 39.  While she states that Zynga created a platform for all advertisers to use, (¶ 4), her subsequent

21 allegations that Zynga created or developed the ads are "threadbare and conclusory" and do not

22 "'show or even intimate' that [the Internet company] contributed to the allegedly fraudulent nature

23 of the comments at issue." *Id.* at 257-258 (quoting *Iqbal*, 129 S.Ct. at 1952).  She states the

24 conclusion that "Defendants' misleading implementation" of the advertising was a substantial factor

25 in her decision to complete the transactions, but does not identify or explain what "misleading

26 implementation" means.  ¶¶ 37-38.  The claims fail for their inability to set out the most minimal

27 of factual allegations describing Zynga's alleged role in formulating the allegedly misleading

28 content.

18

1     **4.     *Goddard v. Google, Inc.* Is Directly On Point and Requires Dismissal.**

2          In *Goddard*, the Google advertising case recently dismissed with prejudice by Judge Fogel of

3     this Court,[6] the plaintiff sought damages based on advertisements appearing with Google's search

4     results.  Third-party advertisers placed ads that users would see next to certain search results

5     depending on what the user typed into the search engine.  The ads at issue in the case offered various

6     services for mobile devices and – after clicking on the ads and entering their cell phone numbers –

7     unexpected charges appeared on users' cell phone bills.  2008 WL 5245490 at *1.  As here, rather

8     than pursuing the third-party advertisers, the plaintiff sued the host.  In an attempt to avoid the CDA,

9     the plaintiff alleged that Google, via its advertising tools, both '"encourage[d]'" and '"collaborate[d]

10    in the development of illegal conduct.'"  640 F.Supp.2d at 1195-1196; *cf.* Complaint ¶ 36 ("Zynga

11    has attempted to induce her to earn virtual in-game currency by participating in" third party

12    advertising).  Also as here, the plaintiff alleged violation of the UCL based on theory that

13    Google was liable independent of the third-party content because it was receiving "tainted

14    funds from fraudulent mobile content providers."  2008 WL 5245490 at *4; *cf.* Complaint ¶¶ 37, 39,

15    69.

16          Judge Fogel granted Google's motion to dismiss on the basis of Section 230 immunity,

17    holding that "Plaintiff claims in essence that she was harmed because Google hosted certain online

18    content, and her UCL claim effectively would hold Google liable for its publication of third-party

19    content in contravention of § 230."  *Id.* at *5.  The Court also dismissed the aiding and abetting,

20    negligence and breach of contract causes of action on similar grounds.  *Id.* at *5-7; 640 F.Supp.2d at

21    1195-1196.  However, Judge Fogel granted leave to amend if the plaintiff could allege that Google

22    itself was an "information content provider" with respect to the content at issue, which would take

23    Google outside of the protection of Section 230.  640 F.Supp.2d at 1195.

24

25    [6]   Judge Fogel issued two opinions, the earlier one granting Google's motion to dismiss with leave
      to amend, *Goddard v. Google, Inc.*, No. C 08-2738 JF, 2008 WL 5245490 (N.D.Cal. Dec. 17,

26    2008) ("*Goddard I*"), and the latter one granting the motion to dismiss the amended complaint
      with prejudice.  *Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D.Cal. 2009) ("*Goddard II*").

27    Both motions were granted on very similar reasoning, and the published opinion made frequent
      citation to the prior unpublished opinion.

28

                                                              19

In response to that order, the plaintiff amended her complaint, alleging that "'Google's involvement [in creating the allegedly fraudulent advertisements] was so pervasive that the company controlled much of the underlying commercial activity engaged in by the third-party advertisers.'" *Id.* at 1196. The plaintiff also alleged that Google "'not only encourages illegal conduct, [but] collaborates in the development of the illegal content.'" *Id.* The Court granted the motion to dismiss the amended complaint with prejudice. *Id.* at 1202. The Court dismissed the amended assertions as "mere 'labels and conclusions' amounting to a 'formulaic recitation of the elements' of CDA developer liability." *Id.* at 1196 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Judge Fogel then analyzed the specific factual allegations of the complaint. The plaintiff claimed that Google was a developer, in part, of the offending content through its advertising keyword tool mechanisms. *Id.* at 1197. She claimed that Google's tools disproportionately suggested certain keywords, such as the use of the word "free" with "ringtone", despite knowing about problems with fraudulent charges in the mobile content industry. *Id.* She further alleged that Google representatives met with advertisers to help them with their creation of advertising on Google. *Id.*

The Court held that these allegations did not create transform Google into a creator or developer of the offending content. *Id.* Citing Ninth Circuit precedent, the Court held the amended complaint still did not allege that Google materially contributed to the content so as to become an information content provider. *Id.* (citing *Carafano*, 339 F.3d at 1124-1125.) Instead, Google merely provided "neutral tools" that that could be used for any purpose. Judge Fogel observed:

> Under *Carafano*, even if a particular tool "facilitate[s] the expression of information," *id.* at 1124, it generally will be considered "neutral" so long as users ultimately determine what content to post, such that the tool merely provides "a framework that could be utilized for proper or improper purposes." *Roommates*, 521 F.3d at 1172 (interpreting *Carafano*). Indeed, as already noted, the provision of neutral tools generally will not affect the availability of CDA immunity "even if a service provider *knows* that third parties are using such tools to create illegal content." *Goddard*, 2008 WL 5245490, at *3 (emphasis added). As a result, a plaintiff may not establish developer liability merely by alleging that the operator of a website should have known that the availability of certain tools might facilitate the posting of improper content.

*Id.* at 1197-1198. As Google merely developed a framework for advertisers to use as they saw fit, it could not be held responsible for that third-party usage, even if it knew misleading ads would

20

1   appear. *Id.* at 1198, 1199. Finally, the Court found confirmation in the Ninth Circuit's holding that

2   any doubts as to the "zone of CDA immunity" must be resolved in favor of immunity. *Id.* at 1202

3   (citing *Roommate.com*, 521 F.3d at 1174). The Court dismissed without leave to amend. *Id.*

4        The present case presents a more compelling case for dismissal than *Goddard*. As in

5   *Goddard*, Swift alleges that Zynga has created a platform for third-party advertisers to use.

6   Complaint, ¶ 8. Also as in *Goddard*, Swift alleges that misleading ads resulted in her being charged

7   *by third-party advertisers* for offers she did not want.  ¶¶ 37-41. However, here, unlike in *Goddard*,

8   there are no substantive factual allegations that the ads at issue were created or developed by Zynga.

9   *Cf. Goddard II*, 640 F.Supp.2d at 1197 (allegation that Google's tools suggested keywords such as

10  "free" with the word "ringtone," thus developing the specific content at issue). Fifteen times in eight

11  pages Swift states that Zynga "created and developed" the advertising content at issue. But, as Judge

12  Fogel held, the Court must look beyond "mere labels and conclusions amounting to a formulaic

13  recitation of the elements of CDA developer liability." *Id.* at 1196 (internal citation and quotation

14  marks omitted). The substance of the complaint alleges that Zynga created a neutral platform for all

15  advertisers to use. *See* ¶ 8. Swift invents a term, "Integrated Special Offer Transactions," in an

16  attempt to more closely tie Zynga to its advertisers. But Swift offers no factual allegations to show

17  how Zynga's conduct makes it any more involved in the creation or development of the advertising

18  content than Google was with its third-party advertising. In fact, Google's advertising was more

19  "integrated" than the present case. Google would suggest to advertisers word combinations that

20  would obtain the most clicks for the advertisers (and hence the most profits for Google). *Goddard*

21  *II*, 640 F.Supp.2d at 1197. But nonetheless, liability could not be based on the fact that "the operator

22  of a website should have known that the availability of certain tools might facilitate the posting of

23  improper content." *Id.* at 1198. Here, Zynga similarly offers a neutral platform for all advertisers to

24  use. Swift uses terms like "business partners" (meaning third-party advertisers) and "created and

25  developed" to attempt to manufacture liability, but offers no factual allegations that would produce a

26  different result than *Goddard*. Rather than pursuing the parties that originated the allegedly harmful

27  content, Swift seeks damages from Zynga, the host site. Such claims, no matter how couched or

28  artfully pled, cannot proceed.

21

1    Plaintiff's claim that Zynga created an advertising system incentivizing users to click on ads

2    to earn virtual currency does not take this case outside the scope of Section 230.  This allegation,

3    even if proven, would have no bearing on CDA immunity.  As the cases involving Google, eBay,

4    AOL and others make clear, websites do not fall outside the CDA merely because they derive

5    revenue from third-party content, even when they encourage or promote the use of the third-party

6    content.  *See, e.g.*, *Drudge*, 992 F.Supp. at 52-53 ("this Court would agree with plaintiffs [that] AOL

7    … has affirmatively promoted Drudge" but nonetheless "Congress has made a different policy

8    choice by providing immunity even where the interactive service provider has an active, even

9    aggressive role in making available content provided by others.");  *Goddard I*, 2008 WL 5245490, at

10   *3; *Goddard II*, 640 F.Supp.2d at 1197-1198[7]; *Gentry*, 99 Cal.App.4th at 830 and 834 (discussion of

11   effect of eBay's 'Power Seller' endorsement on users).  As in the above cases, Zynga has merely

12   created a neutral forum for *all* third-party advertisers to use.  Complaint, ¶ 8.  The alleged fact that

13   Zynga makes money from its advertisers, or encourages its users to consider the offers that appear

14   on Zynga's pages, does not remove CDA protection.  *Id*.  This is similar to the set of allegations

15   made against Google and dismissed by Judge Fogel.

16   **B.    The Complaint Sounds in Fraud But Is Not Pled With Particularity.**

17   A complaint must satisfy the particularity requirement of FRCP 9(b) when a plaintiff alleges

18   that the defendant engaged in a course of fraudulent conduct, and that conduct forms the basis of the

19   plaintiff's state law claims.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  The

20   complaint must plead in detail the nature of the misleading conduct by the defendant.  FRCP 9(b);

21   *Id*. at 1127 (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-1104 (9th Cir. 2003)).  It

22   must identify "the who, what, when, where, and how of the misconduct."  *Vess*, 317 F.3d at 1106

23   (citation and quotation marks omitted).  Here, Plaintiff's claims are grounded in the alleged

24

---

25   [7] In the Google sponsored search system "[t]he price per keyword is determined by a bidding
     process, wherein the highest bidder for a keyword would have its ad placed at the top of the list of
26   results from a Google.com search by an internet user."  *Feldman v. Google, Inc.*, 513 F. Supp. 2d
     229, 232 (E.D. Pa. 2007).  In that way, Google encourages users to engage with those ads that
27   generate the most revenue for Google.

28

22

1   intentional conduct of Zynga.  Plaintiff's allegations hinge on Zynga's purported role in a

2   "fraudulent scheme" (¶ 1) where Zynga "conspired" (¶ 30) in third-party advertisers' attempts to

3   "mislead" (¶ 16) people into clicking on "scam" ads.  ¶ 33.  But even after amending her complaint,

4   Swift still fails to allege the *facts* necessary to make out a claim of fraudulent conduct by Zynga.

5        Zynga raised many of the same points discussed below in its motion to dismiss the original

6   complaint.  The fact that Swift has not even attempted to address these points, other than by adding

7   new legal conclusions, is telling and strongly suggests that another opportunity to amend the

8   complaint would be futile.  For example, Zynga pointed to the fact that the original complaint did

9   not allege any facts as to how Zynga supposedly knew the third-party ads were false, or what Zynga

10   did to encourage Swift to accept the particular ads at issue, as opposed to ads generally.  Mtn. to

11   Dismiss Orig. Compl. at 22:9-13.  Additionally, Zynga argued that it was impossible to tell for at

12   least one of the ads what offer Swift thought she was signing up for and what she *did* think would

13   happen when she entered her cell phone number.  *Id*. at 22:14-22.  Swift has offered no new facts on

14   these, or any other, points.

15        The Ninth Circuit recently analyzed the particularity requirement in the context of UCL and

16   CLRA claims.  In *Kearns*, the putative class representative alleged that Ford's Certified Pre-Owned

17   vehicle ("CPO") program violated the UCL and CLRA.  567 F.3d at 1123.  Specifically, the plaintiff

18   alleged that Ford made false and misleading statements concerning CPOs' safety, reliability, and

19   vehicle certification process, and accordingly that it intentionally misled consumers.

20        The Ninth Circuit held that the complaint failed to meet the heightened pleadings standard of

21   Rule 9(b).  *Id*. at 1124-1125.  The court observed that all claims brought in federal court, no matter

22   how styled, must be pled with particularity if grounded in fraud.  *Id*. at 1125, 1127.  The plaintiff

23   argued that his claims could be construed to allege "unfair" rather than "fraudulent" business

24   practices under the UCL and CLRA, and thus were not necessarily grounded in fraud.  The court

25   disagreed.  Because the plaintiff alleged Ford conspired with its dealerships to misrepresent program

26   benefits, and its marketing materials made representations about the quality of CPOs, the plaintiff

27   was alleging "that Ford engaged in a fraudulent course of conduct." *Id*. at 1125-1126.  For this

28   reason, the complaint failed for not pleading with specificity each of the elements of fraud.

23

The present case is more compelling than *Kearns*.  In *Kearns*, the Ninth Circuit rejected the argument that the UCL and CLRA claims were not grounded in fraud even though it seemed that the plaintiff could arguably make out a case of "unfair" or negligent business practices.  Here, by contrast, Plaintiff's claims all revolve around Zynga's alleged conspiratorial conduct and fraudulent intent to "entice Zynga game users into" clicking on scam ads despite purportedly knowing that the ads were "false and misleading."  ¶¶ 8, 14.  Similarly, claims for common law restitution[8] must describe the defendant's "fraud, duress, conversion, or similar conduct" that caused the plaintiff's harm.  *Rosal v. First Fed. Bank of Calif.*, __ F.Supp.2d __, 2009 WL 2136777 at *16 (N.D.Cal. 2009) (quoting *McBride v. Boughton*, 123 Cal.App.4th 379, 388 (2004)).  Swift alleges her harm arises from Zynga's alleged conspiracy with third-party advertisers to mislead users into clicking on misleading ads.  But she fails to allege any facts that support the elements of a fraud claim.

The elements of fraud under California law are: (1) a false representation, concealment, or nondisclosure; (2) knowledge of the falsity; (3) an intent to induce reliance; (4) justifiable reliance; and (5) resulting damage.  *Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951, 974 (1997).  A claim grounded in fraud must identify "the who, what, when, where, and how of the misconduct" that the defendant allegedly committed.  *Vess*, 317 F.3d at 1106 (9th Cir. 2003) (internal citation and quotation marks omitted).  Here, Swift does not provide the webpages or set out the specific misrepresentations upon which she allegedly relied.  She does not allege any facts as to how Zynga supposedly knew these third-party ads were false; that is, whether Zynga knew that statements made in the ads were untrue, or what Zynga did to encourage Swift to accept the particular ads at issue.  She uses disingenuous labels (like "business partner" instead of "third-party advertiser", ¶¶ 37, 39),

---

[8]  Plaintiff's third claim for relief is for "unjust enrichment."  However, "'there is no cause of action in California for unjust enrichment.'"  *Rosal v. First Federal Bank of Calif.*, __ F.Supp.2d __, 2009 WL 2136777 at *16 (N.D.Cal. 2009) (quoting  *Melchior v. New Line Productions, Inc.*, 106 Cal.App.4th 779, 793 (2003)).  Rather, unjust enrichment is a general legal principle – a theory of recovery indistinguishable from restitution.  *Id.* Restitution may be awarded either (1) in lieu of breach of contract damages, where an asserted contract is found to be unenforceable or ineffective, or (2) where the defendant obtained a benefit from the plaintiff by "fraud, duress, conversion, or similar conduct," but the plaintiff chooses not to sue in tort.  *Id.* at *16 (citing *McBride*, 123 Cal.App.4th at 388).  Swift alleges no breach of contract; thus, her claim must proceed under the latter theory.

24

factually-devoid conclusions ("Defendant's misleading implementation . . . was a substantial factor in Plaintiff's decision to provide her cell phone number," ¶ 37) and invented terminology ("Integrated Special Offer Transactions" or "ISOTs") but fails to state anything that Zynga actually did related to the ads at issue.

Swift includes no details about the first ad she allegedly completed. She gave her cell phone number to an advertiser ("business partner") to receive a code she could redeem for points. ¶ 37. But she does not identify or describe the ad, explain what she thought the ad was for, or what she thought *would* happen in exchange for her entering her cell phone number. *See id.* Swift admits players are aware they can obtain game points by completing ad offers. *See, e.g.* ¶ 6. What "transaction" (¶ 37) *did* Swift think she was accepting? For both of the ads Swift identifies, she states the conclusion that "Defendants' misleading implementation" of the advertising was a "substantial factor" in her decision to complete the "transaction[s]." [¶¶ 37-38.] But Swift makes no attempt to identify or explain at all what "misleading implementation" means.

None of these details can be discerned from the face of the complaint. Under *Kearns*, the Complaint must be dismissed as providing only conclusory allegations without any support.

## V.   CONCLUSION

For all the foregoing reasons, and because the CDA "protect[s] websites not merely from ultimate liability, but from having to fight costly and protracted legal battles," *Roommate.com*, 521 F.3d at 1175, Zynga respectfully requests that Plaintiff's First Amended Complaint be dismissed with prejudice for its failure to state a claim upon which relief can be granted.


Dated: March 1, 2010                          DUANE MORRIS LLP

                               By:   _____/s/_____
                                     Richard L. Seabolt
                                     Suzanne R. Fogarty
                                     Oliver E. Benn
                                     Attorneys for Defendant,
                                     ZYNGA GAME NETWORK, INC.

DM1\2075878.2

Zynga - Motion to Dismiss First Amended Complaint
CV 09-5443 SBA