**KERSHAW, CUTTER & RATINOFF, LLP**
William A. Kershaw (State Bar No. 057486)
Email:  wkershaw@kcrlegal.com
C. Brooks Cutter (State Bar No. 121407)
Email:  bcutter@kcrlegal.com
Stuart C. Talley (State Bar No. 180374)
Email: stalley@kcrlegal.com
John R. Parker, Jr. (State Bar No. 257761)
Email: jparker@kcrlegal.com
401 Watt Avenue
Sacramento, California  95864
Telephone: (916) 448-9800
Facsimile:  (916) 669-4499

**WEXLER WALLACE LLP**
Mark J. Tamblyn (State Bar No. 179272)
Email: mjt@wexlerwallace.com
Ian J. Barlow (State Bar No. 262213)
Email:  ijb@wexlerwallace.com
455 Capitol Mall, Suite 231
Sacramento, California 95814
Telephone:  (916) 492-1100
Facsimile:  (916) 492-1124

Attorneys for *Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA SWIFT, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br><br>ZYNGA GAME NETWORK, INC., ADKNOWLEDGE, INC.; D/B/A SUPER REWARDS; KITN MEDIA USA, INC., D/B/A SUPER REWARDS;<br><br>Defendants. | Case No.  CV 09-5443 SBA<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ZYNGA GAME NETWORK'S MOTION TO DISMISS**<br><br>Date: June 29, 2010<br>Time: 1:00 p.m.<br>Courtroom 1<br>Assigned to Judge Saundra Brown Armstrong<br><br>Complaint Filed: 11/17/09<br>Trial Date: None Set |

1

## <u>TABLE OF CONTENTS</u>

2

Page(s)

3

I.      INTRODUCTION ................................................................................................. 1

4

II.     FACTS ................................................................................................................. 3

5

        A.     Zynga's Relationship with Offer Agregattors ........................................ 5

6

        B.     In November 2009, Zynga Admits That *All* ISOTS Appearing in its Games are

7                      Fraudulent and Removes Them From its Games. ................................... 6

8

III.    THE CDA .......................................................................................................... 7

9

IV.     THE CDA DOES NOT APPLY TO PLAINTIFF'S CLAIMS BECAUSE THOSE

10      CLAIMS DO NOT SEEK TO HOLD ZYNGA STRICTLY LIABLE AS A

        "PUBLISHER" OF ILLEGAL CONTENT ........................................................ 9

11

12      V.      EVEN IF THE CDA DID ENCOMPAS THE PLAINTIFF'S CLAIMS, ZYNGA

        IS NOT ENTITLED TO IMMUNITY BECAUSE IT IS AN "INFORMATION

13      CONTENT PROVIDER" ................................................................................... 12

14

        A.     Zynga Has Both "Created" And "Developed" The ISOTs At Issue In

15                     This Case. ............................................................................................. 14

16      B.     None of The Cases Cited By Defendants Even Approaches The Type of

                       Direct Involvement and "Material Contribution" Alleged in The Complaint. ..... 16

17

18      VI.     THE CDA DOES NOT GRANT IMMUNITY FOR VIOLATIONS OF FEDERAL

        WIRE FRAUD STATUTES ............................................................................. 18

19

20      VII.    PLAINTIFF HAS PLED HER CLAIMS WITH SUFFICIENT PARTICULARITY ...... 20

21      A.     Plaintiff Is Not Required To Plead Each Element of Fraud Since Fraud Is

                       Not A Cause of Action In Her Complaint. ............................................ 20

22

        B.     Plaintiff's Complaint Pleads Sufficient Facts To Show That Defendant

23                     Engaged In A Business Practice That Was "Likely to Deceive The Public" ....... 21

24      VIII.   CONCLUSION .............................................................................................. 24

25

26

27

28

OPPOSITION TO ZYNGA GAME NETWORK'S MOTION TO DISMISS        CV 09-5443 SBA

1

## **TABLE OF AUTHORITIES**

2

### **FEDERAL CASES**

3

Page(s)

4

*800-JR Cigar, Inc. v. GoTo.com, Inc.,*
  437 F.Supp.2d 273 (D.N.J.2006) ................................................................................ 11

5

*Baas v. Dollar Tree Stores, Inc.,* No. C 07-03108 JSW,
6
  2007 U.S. Dist. LEXIS 65979, at *5 (N.D. Cal. Aug. 29, 2007)...................................... 20

7

*Barnes v. Yahoo!, Inc.,*
8
  570 F.3d 1096 (9th Cir.2009)...................................................................................... 9,10

9

*Batzel v. Smith,*
  333 F.3d 1018 (9th Cir.2002)...................................................................................... 18
10

*Ben Ezra, Weinstein, and Co. v. America Online Inc.,*
11
  206 F.3d 980 (10th Cir.2000)...................................................................................... 18

12

*Carafano v. Metrosplash.com, Inc.,*
13
  339 F.3d 1119 (9th Cir.2003)...................................................................................... 7,9,14

14

*Cirulli v. Hyundai Motor Am.,* No. SACV 08-0854 AG (MLGx),
15
  2009 U.S. Dist. LEXIS 125139, at *11 (C.D. Cal. June 12, 2009).................................. 23

16

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC,*
  521 F.3d 1157 (9th Cir.2008)................................................................................. *passim*
17

*F.T.C. v. Accusearch Inc.,*
18
  570 F.3d 1187 (10th Cir.)............................................................................................ 10,11

19

*FTC v. Swish Mktg.,* No. C 09-03814 RS,
20
  2010 U.S. Dist. LEXIS 15016, at *7 (N.D. Cal. Feb. 22, 2010)...................................... 21

21

*Goddard v. Google, Inc.,*
22
  640 F.Supp.2d 1193 (9th Cir.2009) ............................................................................. 16,17

23

*Green v. America Online,*
  318 F.3d 465 (3d Cir.2003)......................................................................................... 18
24

*Gruen v. Edfund,* No. C 09-00644 JSW,
25
  2009 U.S. Dist. LEXIS 60396, at *14 (N.D. Cal. July 15, 2009) .................................... 21

26

*In re Mattel, Inc.,*
27
  588 F. Supp. 2d 1111 (C.D. Cal. 2008) ........................................................................ 21

28

-ii-

**TABLE OF AUTHORITIES, Cont.**

Page(s)

*Kearns v. Ford Motor Co.*
   567 F.3d 1120 (9th Cir. 2009)...................................................................... 20,21

*Keilholtz v. Superior Fireplace Co.*, No. C 08-00836 CW,
   2009 U.S. Dist. LEXIS 30732, at *14 (N.D. Cal. Mar. 30, 2009) .................................... 23

*Marcelos v. Dominguez*, No. C 08-00056 WHA,
   2008 U.S. Dist. LEXIS 91155, at *32 (N.D. Cal. July 18, 2008) ............................... 21,23

*Mazur v. eBay Inc*., No. C 07-03967 MHP,
   2008 U.S. Dist. LEXIS 16561, at *28, *37 (N.D. Cal. Mar. 4, 2008) ............................ 11

*Moore v. Kayport Package Exp., Inc.*,
   885 F.2d 531 (9th Cir. 1989)......................................................................... 20

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993)........................................................................... 20

*Rand v. Am. Nat'l Ins. Co.*, No. C 09-0639 SI,
   2009 U.S. Dist. LEXIS 64781, at *15 (N.D. Cal. July 28, 2009) .................................... 20

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 N.Y. Misc. LEXIS 229 (N.Y. Sup. Ct. May 24, 1995) (unpublished)...................... 7

*United States v. Bohonus*,
   628 F.2d 1167 (9th Cir.)............................................................................. 19

*United States v. Green*,
   745 F.2d 1205 (9th Cir.1984)........................................................................ 19

*Virden v. Graphics One*,
   623 F.Supp. 1417 (1985)............................................................................. 19

*VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*,
   673 F. Supp. 2d 1073 (E.D. Cal. 2009)............................................................ 21

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir.1997)......................................................................... 18

**STATE CASES**

*Roskind v. Morgan Stanley Dean Witter & Co.*,
   80 Cal.App.4th 345 (2000) ........................................................................... 19

-iii-

1

## **TABLE OF AUTHORITIES, Cont.**

2

### **STATUTES**

3

### **FEDERAL**

4

Page(s)

5

18 U.S.C.A. Section 1341 ....................................................................................................... 18,19

6

18 U.S.C.A. Section 1343 ....................................................................................................... 18,19

7

42 U.S.C. Section 230 .............................................................................................................. *passim*

8

Federal Rules of Civil Procedure, Rule 9(b) ........................................................................... 20,21

9

### **STATE**

10

11

California Business & Professions Code Section 17200 ......................................................... 19,21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.      INTRODUCTION**

2          This case seeks to hold Zynga and its co-conspirators responsible for theft; theft that was

3    publicly acknowledged by Zynga's own CEO, Mark Pincus.  Contrary to Zynga's arguments, the

4    Communications Decency Act ("CDA") does not give Zynga a license to steal.  Attempting to

5    evade liability for the "horrible things" it has acknowledged doing, Zynga mischaracterizes the

6    allegations in Plaintiff's complaint and ignores its own role in the massive fraud that was

7    perpetrated against thousands of individuals.  Here, Plaintiff does not seek to hold Zynga liable

8    for being a "publisher" of "content."  Rather, Plaintiff seeks to hold Zynga liable for its *conduct*

9    in helping to steal millions of dollars from thousands of individuals.

10         Specifically, Plaintiff alleges that Zynga intentionally designed its games to create a

11   demand among players for the "virtual currency" that is integrated into those games.  Zynga then

12   used the demand for this virtual currency to entice consumers into responding to Integrated

13   Special Offer Transactions ("ISOTs") that appear within Zynga's games.  At all times, Zynga

14   knew the ISOTs were designed to steal money from consumers and Zynga orchestrated this

15   scheme in order to receive a share of the stolen proceeds.  This is what Zynga calls "monetizing"

16   its otherwise "free" games.  This *conduct* is the essence of Plaintiff's First Amended Complaint

17   ("FAC"); not Zynga's role as a "publisher" or "speaker" of "content."

18         Zynga's Motion to Dismiss must be denied.  First, the CDA does not apply to the conduct

19   alleged in the FAC.  The CDA was enacted to prevent states from imposing strict liability against

20   websites that have merely published illegal content supplied by others.  Specifically, it provides

21   that no website "shall be treated as the publisher or speaker of any information provided by

22   another information content provider."  47 U.S.C. § 230(c).  However, Plaintiff does not seek to

23   hold Zynga strictly liable as a "publisher" or "speaker" of illegal "content."  Rather, Plaintiff

24   seeks to hold Zynga liable as an active participant in the theft of millions of dollars from

25   consumers throughout the United States.  The CDA does not provide immunity from theft.

26         Second, even if the CDA did apply to Plaintiff's claims, Zynga and its co-conspirators are

27   not entitled to immunity because they are "information content providers."  The CDA does not

28   provide immunity to websites that are "responsible in whole or in part" for either "creating or

-1-

developing" the content that is the subject of the Complaint.  47 U.S.C. § 230(f)(3).  A website will be deemed to have "developed" content if, instead of being a neutral, passive conduit of content, it materially contributes to the alleged illegal conduct or somehow acts to enhance the content.  *See Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167-1168 (9th Cir. 2008).  Here, Zynga's "material contribution" to the unlawful conduct is clearly alleged in the FAC.

The design of the ISOTs, their placement within Zynga's games, and the language of the ISOTs offering virtual currency are all created by Zynga.  (FAC ¶¶ 6, 8, 13, 14, 15, 16, 19, 20, 22, 33, 34, 37, 38, 39, 40, 41.)  In fact, many of the ISOTs appearing in Zynga's games are fully integrated into the games themselves and consumers participating in the games do not even realize they are dealing with third parties.  (*Id.*)  Zynga is also responsible for crediting consumers' accounts with virtual currency in exchange for the consumers' participation in the ISOTs, and receives a portion of the money stolen from consumers.  (*Id.*)  By providing free virtual currency to consumers and then receiving real money in return, Zynga not only caused the fraud to occur but is an actual party to the illegal transactions that are the subject of this case. (*Id.*)  No case cited by the defendant involves the type of active participation, enhancement, and material contribution that is present here.

Third, even if Zynga was not an "information content provider," it would still not be entitled to CDA immunity, because Plaintiff's UCL claims allege that Zynga has violated Federal wire and mail fraud statutes.  The CDA expressly does not provide immunity from the violation of Federal criminal statutes.  *See* 47. U.S.C. § 230(e)(1).

Finally, Defendant's argument that the FAC is not plead with adequate specificity are without merit.  The FAC in this case describes, in detail, Zynga's conduct leading to the theft of millions of dollars from thousands of individuals.  (FAC ¶¶ 6, 8, 13, 14, 15, 16, 19, 20, 22, 33, 34, 37, 38, 39, 40, 41.)  It describes how Zynga designed its games to create a demand for virtual currency and how it used that demand to lure consumers into responding to ISOTs it knew were fraudulent.  (FAC ¶¶ 6, 8, 13, 14, 15, 16, 19, 20, 22, 33, 34, 37, 38, 39, 40, 41.)  In fact, the FAC actually provides a link to a video that graphically describes in detail how the Defendants' ISOTs

are misleading, provided in electronic form as Exhibit 1 to Plaintiff's concurrently-filed Request

for Judicial Notice.  Additionally, the FAC extensively quotes Zynga's own CEO, Mark Pincus,

wherein he expressly acknowledges Zynga's direct involvement in the fraud that is the subject of

this case, and admits that the "horrible things" Zynga has done were intended to "generate

revenue" for Pincus' new company.  (FAC ¶ 16.)  Rarely does a complaint contain such specific

factual allegations.

## II.   FACTS

Defendant Zynga Game Network Inc. ("Zynga") is in the business of developing and

making available to users of Facebook, MySpace, and other social networking sites a large

variety of popular on-line games that include titles such as Mafia Wars, YoVille!, FarmVille, and

Poker.  (FAC ¶ 1.)  These games have become wildly popular with an estimated 40 million active

players throughout the United States.  (FAC ¶ 31.)

Zynga's games are played online over the internet and are offered to users free of charge.

(FAC ¶ 2.)  However, since its inception, Zynga has admittedly sought to generate revenue from

its otherwise "free" games through a process it calls "monetization."  (*Id.*)  Although most "free"

content made available on the internet is supported through traditional banner advertising, where

advertisers pay for the right to present advertisements that appear next to or along with the "free"

content, Zynga has taken a different tack.  (*Id.*)  Instead of hosting advertisements to its users,

Zynga generates revenue by selling "virtual currency" to players within its games.  (*Id.*)

Specifically, Zynga has designed its games so that they are social in nature, allowing the

players to create an online persona or avatar that can interact with other players' personas or

avatars.  (FAC ¶ 3.)  Each of these games is also competitive, allowing players to compare their

virtual accomplishments with each other on Facebook or other social networks, and, in many

cases, allowing them to compete with each other directly within the game.  (*Id.*)  In its effort to

"monetize" its games, Zynga has designed them to be more enjoyable for users who have

acquired greater amounts of "virtual currency" within the game.  (FAC ¶ 4.)  Players who have

acquired virtual currency in each game can use it to acquire more in-game goods and services, to

unlock new levels of the game, to better compete against other players, or to otherwise make the

-3-

game more enjoyable.  (*Id.*)  Virtual currency can be acquired when players slowly "earn" it by accomplishing various tasks in the game, through means that are entirely dictated by Zynga.  (*Id.*)  However, when players "earn" their own virtual currency within these games Zynga gains nothing—which is why it may only be "earned" very slowly.  (*Id.*)  Accordingly, Zynga has pushed its users to acquire virtual currency in other ways that directly enrich Zynga.  (*Id.*)

Generally, users can purchase virtual currency directly from Zynga.  (FAC ¶ 5.)  However, most Zynga game users are unwilling to pay real-world money for "virtual currency" inside a video game.  (*Id.*)  Accordingly, Zynga provides another way for users to acquire virtual currency: through "special offer" transactions that Defendants have created and developed to be integrated within each of Zynga's game applications.  (FAC ¶ 6.)  Through these "Integrated Special Offer Transactions," or "ISOTs," Zynga provides users in-game virtual currency in exchange for users' participation in "special offers."  (*Id.*)

For example, players of the game Farmville create a virtual farm where they can grow crops, purchase animals, etc.  (FAC ¶ 12.)  When a player reaches some goal in the game (for example by harvesting a new crop), the players' friends on Facebook are advised of the player's accomplishment.  Additionally, throughout the game, players are able to "earn" virtual currency through their accomplishments and are then able to spend this currency on new seeds, farm equipment, etc. at an on-line "Marketplace" that is integrated into the game.  (FAC ¶¶ 4, 5, 6.)

However, within Farmville and other Zynga games, players are also given the option of obtaining virtual currency by responding to ISOTs.  (FAC ¶ 6.)  The ISOTs are located prominently within the Marketplace and appear to be part of the Zynga game itself *See*, *e.g.*, Exhibit 3 to Plaintiff's Request for Judicial Notice, a screen shot from a Zynga game that lists a series of ISOTs featured in Tech Crunch's article "'Horrible Things' Slink Back Into Zynga," referenced at FAC ¶ 13.  Next to each ISOT is a large button that prominently displays how much free virtual currency the player can receive by responding to the offer.  (*Id.*)  Next to the button is a description of the offer.  (*Id.*)

One of the most common ISOTs appearing in Zynga games are "quizzes" and "IQ tests."  The ISOTs state that if the consumer takes an "IQ test" or other quiz, or achieves a certain score,

-4-

the consumer will receive a specified amount of virtual currency.  (FAC ¶ 13.)  After the

consumer clicks on the ISOT he or she is then directed to the "test" that must be completed in

order to obtain virtual currency in a Zynga game.  At the end of the test, the consumer is asked for

her cell phone number and is told that she will receive a text message of the results.  (*Id.*)  What

the player is not told (or is told in extremely fine print at the bottom of the ISOT) is that by

providing her cell phone number, the consumer is signing up for a useless text message service

that will result in a monthly charge of $10 on their cell phone bill.  (*Id.*)  Once the consumer has

completed the transaction, her game account is credited with virtual currency by Zynga, and

Zynga receives a fee from the text messaging service that is now billing the consumer for a

useless service.  (*Id.*)  A video describing this scam and how it works can be found at

http://techcrunch.com/2009/11/07/horrible-things-slink-back-into-zynga/ and is attached to

Plaintiff's Request for Judicial Notice as Exhibit 1.

The use of these highly misleading ISOTs has been extremely profitable to Zynga.  With

over 40 million players on its games, it is estimated that Zynga has received in excess of $84

million from consumers who were taken in by fraudulent ISOTs.  (FAC ¶ 34.)

**A.      Zynga's Relationship with Offer Aggregators**

Although most individuals participating in an ISOT transaction have no idea they are

dealing with anyone but Zynga, the ISOT transactions actually involve several different parties.

(FAC ¶ 6.)  Specifically, Zynga has partnered with several "offer aggregators" whose role it is to

solicit and then "aggregate" offers from numerous third parties who are seeking to promote their

scams through Zynga's ISOTs.  (FAC ¶ 8.)  These "aggregators" then broker the deal between the

third parties and Zynga to allow the scam to be incorporated into an ISOT that appears within

Zynga's games.  (*Id.*)  When consumers participate in one of the ISOT scams, the funds obtained

from players are then split among the third party, the aggregator, and Zynga.  (*Id.*)

Plaintiff alleges that this system of utilizing "offer aggregators" is intentionally designed

to create a buffer between Zynga and disreputable third parties stealing from consumers over the

internet.  (FAC ¶ 10.)  In fact, Plaintiff is informed and believes that some of these agregattors

may have been funded by Zynga's owners in order to facilitate these fraudulent transactions.

-5-

(FAC ¶ 11.)

### B.   In November 2009, Zynga Admits That *All* ISOTS Appearing in its Games are Fraudulent and Removes Them From its Games.

In November 2009, a video tape of a speech given by Zynga, CEO Mark Pincus, was posted on the internet.  In this speech, Mr. Pincus readily admitted that the ISOTs appearing within Zynga's game applications were designed to mislead consumers and generate increasing revenue for its business.  (FAC ¶ 16.)  Specifically, in Spring 2009, Mr. Pincus described how shortly after founding Zynga he desperately needed revenue in order to keep control of his company.  (*Id.*)  He then boasted that this revenue was primarily generated through scams like the one described above:

> "Like I needed the revenue now.  So, so **I funded the company myself but I did every horrible thing in the book to just get revenues right away.**  I mean we gave our users poker chips if they downloaded this wiki toolbar, which was like . . . I don't know.  I downloaded it once and I couldn't get rid of it.  **We did anything possible to just get revenues so that we could grow and be a real business.**"
> (Emphasis added.)

(FAC ¶ 16.)

After making this public admission, many media outlets began to question Zynga's practices surrounding its ISOTs.  (FAC ¶ 17).  In response to this controversy, in November 2009, Zynga purported to have banned *all* ISOTs within its game applications.  (*Id.*)  In fact, in a belated acknowledgement that Zynga's ISOTs were deceptive or worse, Mr. Pincus publicly conceded that all such offers would be banned "*until we see any that offer clear user value.*"  (*Id.*)

Later Mark Pincus attempted to clarify his previous comments.  However, in doing so, he again admitted Zynga's direct involvement in the scams that lead to the theft of millions of dollars from thousands of individuals:

> "that was a video, uh, that was taken while I was giving a talk, uh, about a year earlier and it was part of a series of talks that I have given since then to entrepreneurs and they're all on the web and I invite people to watch all of them and **the real point I was making was that, as entrepreneurs, we ought to have**

-6-

1    **profitable services as early as we can so we can control our destinies and so**

2    **we can be in a position, as my company was recently, to do the right thing and**

3    **make the long-term decisions like, get rid of all offers**." (Emphasis added.)

4    Thus, Zynga's own CEO has admitted that Zynga has known for some time that the

5    ISOTs Zynga and its partners designed and promoted were taking advantage of Zynga's users but

6    that its actions were somehow "justified" by Zynga's need for revenue.  It was only after Zynga's

7    misdeeds were made public that Zynga purported "to do the right thing."  (FAC ¶¶ 19-20.)

8    However, to date, Zynga has not offered to reimburse any of the thousands of users who were

9    misled by the bogus ISOTs appearing within its games.  (FAC ¶ 21.)

10   **III.    THE CDA**

11   The Communications Decency Act or "CDA" can be found at 42 U.S.C. Section 230.  It

12   was enacted by Congress primarily in response to a state court decision against an internet service

13   provider that was found strictly liable for allowing a third party to post a libelous message on one

14   of its financial message boards.  *Stratton Oakmont, Inc. v. Prodigy Servs. Co*., 1995 N.Y. Misc.

15   LEXIS 229 (N.Y. Sup. Ct. May 24, 1995) (unpublished)  The decision was based on a finding

16   that, under state law, the internet provider had become a "publisher" of the libelous material

17   because it voluntarily deleted some messages from its message boards "on the basis of

18   offensiveness and bad taste."  *Id*. at *10.

19   In response to this decision, Congress enacted the CDA "to promote the free exchange of

20   information and ideas over the Internet and to encourage voluntary monitoring for offensive or

21   obscene material."  *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1122 (9th Cir. 2003).  To

22   accomplish this, Congress created certain immunities for websites that allow third parties to post

23   content on their sites.  Specifically, the CDA provides:

24   (1) Treatment of publisher or speaker

25   No provider or user of an interactive computer service shall be treated as the
     publisher or speaker of any information provided by another information content
26   provider.

27   (2) Civil liability

28   No provider or user of an interactive computer service shall be held liable on

-7-

account of--

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)," 47 U.S.C. Section 230 (b)

Section (f)(2) defines "Interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."

Section (f)(3) defines "Information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." By its terms, the grant of immunity found in Section 230(c)(1) and (2) applies only if the interactive computer service is not also an "information content provider."

A website operator can be both an "interactive service provider" and a "content provider." *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162-1163 (9th Cir. 2008) (hereinafter "*Roomates.Com*"). If the website "passively" displays content that is created entirely by third parties, then it is only a service provider with respect to that content. *Id.* However, as to content that it creates itself, or is "responsible, in whole or in part" for "creating or developing," the website is a content provider and not entitled to CDA immunity. *Id.*

The leading Ninth Circuit decision on the scope of CDA immunity is *Roommates.Com*. In this case, the Ninth Circuit went to great lengths to describe under what circumstances a service provider may become an "information content provider" that is not entitled to CDA immunity. Noting the difference between "creating" and "developing" content for a website, the court found that the definition of a "content provider" encompasses much more than just the entity that created the content that appears on the website. Rather, a website will be deemed a "content

provider" even if it did not "create" the content as long as it "materially contributes to the alleged illegal conduct." *Id.* at 1167-1168.

## IV.   THE CDA DOES NOT APPLY TO PLAINTIFF'S CLAIMS BECAUSE THOSE CLAIMS DO NOT SEEK TO HOLD ZYNGA STRICTLY LIABLE AS A "PUBLISHER" OF ILLEGAL CONTENT

The CDA was enacted "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1122 (9th Cir.2003).  Zynga attempts to repurpose the CDA from the promotion of free speech to the immunization of theft.  To do this, Zynga repeatedly discusses the "content" presented on and within its games and how Plaintiff is attempting to impose liability for this "content." (*I.e.,* Mot. at 6.)  However, Plaintiff's false advertising and CLRA claims are not based on "content;" they are based on *conduct*.  The Plaintiff is not attempting to hold Zynga strictly liable for merely "publishing" false advertisements.  Rather, Plaintiff is seeking to impose liability for Zynga's active orchestration of and participation in a scheme designed to entice consumers to respond to fraudulent ISOTs through Zynga's creation and distribution of virtual currency.  It is Zynga's *conduct*, both before and after the ISOTs are promoted through its games, that gives rise to Plaintiff's claims.  This is a fundamental distinction between this case and every reported decision cited in the defendant's brief.

For example, when a bank robber walks into a bank and states "give me all the money," he is not prosecuted for "publishing" the words "give me all the money."  He is prosecuted for the act of stealing.  Additionally, the accomplice who drives the get away car for the robber is not prosecuted for "content" that was "published" by his accomplice.  Although "speaking words" is how the robber and accomplice eventually obtained money from the bank, the claims against them arise not from this speech but from the actions that follow.  It is the bank robbery transaction itself that gives rise to the robber and accomplices' liability.

The important difference between claims premised on "publication" and those that are not is explained in *Barnes v. Yahoo!, Inc.* 570 F.3d 1096 (9th Cir. 2009).  In *Barnes*, the plaintiff's

-9-

ex-boyfriend posted offensive and unauthorized content about Plaintiff on one of Yahoo!'s public profile pages. *Id.* at 1098-1099. Although Yahoo! had a policy allowing individuals to remove such content from its profile pages, Yahoo! failed to remove the offensive material. *Id.* The plaintiff's complaint against Yahoo! alleged that Yahoo! was liable for failing to remove the offensive content. *Id.* at 1099. The Ninth Circuit found that although the CDA barred claims based on a cause of action of negligent undertaking, a cause of action for promissory estoppel was not barred by the CDA. *Id.* at 1105, 1109. Even though the two causes of action were based on identical conduct (failing to remove the offensive content), the court distinguished the two claims by looking at the nature of the claim and whether the claim sought to impose liability for "publication."

Specifically, the court noted that "by its terms . . . section (c)(1) only ensures that in certain cases an internet service provider will not be 'treated' as the 'publisher or speaker' of third-party content for the purposes of another cause of action. [Therefore] the question before us is how to determine when, for purposes of this statute, a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content." *Barnes*, 339 F.3d at 1101. The court answered this question by finding that the CDA only provides immunity from causes of action that are premised on "publication." *Id.* "To put it another way, courts must ask whether the duty that Plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Id.* at 1101-1102.

In a case from the Tenth Circuit, a concurring opinion that relies on *Barnes* expanded on this content/conduct distinction. *See F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1206 (10th Cir.). In *Accusearch*, the FTC brought suit against a website that obtained private telephone information about consumers and sold that information through its website. *Id.* at 1190. The FTC alleged that the defendant purchased the information from private third parties who had obtained it illegally. *Id.* at 1191. The defendant sought immunity under the CDA, arguing that it was merely the publisher of third party "content." In rejecting this argument, the concurring justice noted:

> "As is clear from the complaint, the FTC's allegations of FTCA violations
> stemmed **not from the content** of the information Accusearch was disclosing (or

-10-

developing), but from **Accusearch's own conduct** in (1) offering the information for sale, (2) soliciting and encouraging third-parties to violate the law in obtaining the information, and (3) ultimately paying these third parties and selling the information to consumers. Accusearch's duty to refrain from engaging in these unfair business practices does not derive from its status or conduct as an Internet website that publishes content.  Rather, the duty the FTC alleged Accusearch violated derives from the expectations that a business would not engage in unlawful or unfair business practices in general (whether the business is a conventional bricks-and-mortar operation or exists entirely on the World Wide Web).  See *Barnes*, 565 F.3d at 566. While Internet publication of the confidential phone data, by itself, may very well be protected by the CDA, **the CDA does not immunize, expressly or implicitly, the manner in which Accusearch conducted its business.  In sum, the CDA does not extend to immunize a party's conduct outside the realm of the Internet just because it relates to the publishing of information on the Internet**." (emphasis added)

*Id.* at 1206.

Other courts have also noted this distinction between content and conduct.  See *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F.Supp.2d 273, 295 (D.N.J. 2006) ("[I]mmunity under the Act applies to any cause of action that would make service providers liable for information originating with a third-party user of the service.  Immunity does not seem to fit here because the alleged fraud is the use of the trademark name in the bidding process, and not solely the information from third parties that appears on the search results page"); *Mazur v. eBay Inc*., No. C 07-03967 MHP, 2008 U.S. Dist. LEXIS 16561, at *28, *37 (N.D. Cal. Mar. 4, 2008) ("The CDA does not immunize [a content provider] for its own fraudulent misconduct....  [Here,] eBay's statement regarding safety affects and creates an expectation regarding the procedures and manner in which the auction is conducted and consequently goes beyond traditional editorial discretion.").

Plaintiff does not seek to hold Zynga liable due to its status as a "publisher of content." Instead, Plaintiff seeks to hold Zynga liable for actively engaging in a conspiracy to steal money from consumers and its participation in transactions designed to mislead consumers.  Specifically,

-11-

1  the FAC alleges that Zynga knew that the ISOTs offered through its games were scams designed

2  to mislead and defraud consumers.  (FAC ¶ 16.)  The FAC further alleges that Zynga

3  intentionally designed its games to entice and encourage consumers to participate in the bogus

4  offers by giving them virtual currency that could be used in the games.  (*Id. ¶¶* 4-6.)  Finally, the

5  FAC alleges that these scams were conducted as part of a joint venture and/or conspiracy with

6  various third parties and that Zynga received a portion of the funds that were stolen from the

7  Class.  (*E.g.*, FAC ¶ 41.)  Accordingly, Plaintiffs' claims have little or nothing to do with the

8  defendant's role as a "publisher" of information.  Plaintiff's claims are based on Zynga's *conduct*

9  in encouraging consumers to be defrauded and its status as a co-conspirator in a scheme designed

10  to steal money.  Just because this conduct was carried out over the internet does not make it legal.

11  **V.    EVEN IF THE CDA DID ENCOMPAS PLAINTIFF'S CLAIMS, ZYNGA IS NOT ENTITLED TO IMMUNITY BECAUSE IT IS AN "INFORMATION CONTENT**
12  **PROVIDER"**

13  The CDA provides no immunity for websites that are also "information content

14  providers."  Section (f)(3) contains a broad definition of an "information content provider"

15  defining it as "any person or entity that is responsible, in whole or in part, for the creation or

16  development of information provided through the Internet or any other interactive computer

17  service."  47 U.S.C. 230(f)(3).

18  The Ninth Circuit discussed the definition of an "information content provider"

19  extensively in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d

20  1157, 1162-1175 (9th Cir. 2008) ("*Roommates*").  In *Roommates*, the defendant ran a website

21  that attempted to match individuals looking for roommates with individuals seeking housing.  *Id.*

22  at 1161-1162.  To do this, the website required users to state their preferences for the gender,

23  family status, and sexual orientation of prospective roommates.  *Id.*  Various fair housing groups

24  sued Roommates.com in federal court, alleging that its business violated the federal Fair Housing

25  Act by allowing members to assert discriminatory preferences for housing.  *Id.* at 1162.  The

26  question before the court was whether the website was entitled to immunity under the CDA even

27  though the allegedly discriminatory content originated from third parties.  *Id.* at 1165.  The Ninth

28  Circuit, in an en banc decision, found that CDA immunity did not apply because the website was

-12-

*both* an "information service provider" *and* an "information content provider." *Id.*

In reaching this decision the court first examined the legislative history underlying the CDA. *Id.* at 1163-1164. In examining this history, the court cautioned against expanding CDA immunity beyond that which Congress originally intended. Noting that the policy considerations underlying the enactment of the CDA had become far less compelling since the statute was originally enacted, the court concluded:

> "The Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses. Rather, it has become a dominant-perhaps the preeminent-means through which commerce is conducted. And its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability."

*Id.* at 1164, n. 15.

After examining this legislative history, the Ninth Circuit then turned to the language of the statue itself and provided guidance as to when a website becomes an "information content provider" that is not entitled to CDA immunity. Here, the court found that the definition of a "content provider" encompasses much more than just the entity that created the content that appears on the website. *Id.* at 1166. Noting that the definition of a "content provider" also encompasses entities that help "develop" content either "in whole or in part," the court found that a website will be deemed a "content provider," if it actually creates the content <u>or</u> "materially contributes to the alleged illegal conduct." *Id.* at 1167-1168. Distinguishing between a website that is merely a passive conduit for content that is posted on it and one that has a more active involvement in the content, the court noted:

> "It's true that the broadest sense of the term 'develop' could include the functions of an ordinary search engine-indeed, just about any function performed by a website. But to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides.

-13-

At the same time, reading the exception for co-developers as applying only to content that originates entirely with the website-as the dissent would seem to suggest-ignores the words '**development ... in part**' in the statutory passage '**creation or development in whole or in part.**' 47 U.S.C. § 230(f)(3) (emphasis added).  We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, **we interpret the term 'development' as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.**

*Id*. at 1167-1168 (emphasis added).

In reaching its decision, the Ninth Circuit also distinguished between a website that merely provides "neutral tools" that may be utilized by unscrupulous third parties and a website that "encourages or enhances" the illegal content created by users.

"[In *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)] we correctly held that the website was immune, but incorrectly suggested that it could never be liable because 'no [dating] profile has any content until a user actively creates it.'  As we explain above, . . . e**ven if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer**.  **Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part.'**  47 U.S.C. § 230(f)(3).

*Id*. at 1166 (emphasis added).

A.     Zynga Has Both "Created" And "Developed" The ISOTs At Issue In This Case.

As set forth above, a website is not entitled to CDA immunity if it "is responsible, in whole or in part, for the creation or development of information provided" on its website.  Accordingly, if the website is "responsible" for "creating" even a "part" of the offensive content,

-14-

1    it is not entitled to CDA immunity.

2         Here, there is no doubt that Zynga is responsible for creating the most critical content of

3    the ISOTs that are incorporated into its games.  The ISOTs appear directly within Zynga's games

4    and each ISOT is highlighted with a large button indicating the amount of free virtual currency

5    the player can receive by responding to the ISOT.  (*See* Exhibit 3 to Plaintiff's Request for

6    Judicial Notice.)  The text of the ISOTs contain detailed language indicating that those who

7    participate in the ISOT will receive a specified amount of free virtual currency.  (*Id.*)  The large

8    buttons and language in the ISOT reporting the amount of Zynga's virtual currency to be awarded

9    are all "content" created by Zynga.  (*Id.*)  In fact, the lure of free virtual currency is the most

10   important "content" within the ISOT because, without it, it is unlikely any consumer would ever

11   participate in an ISOT.

12        Additionally, Zynga is responsible for the design, layout, and format of the ISOTs, and the

13   ISOTs appear directly within Zynga's games.  (FAC ¶¶ 12, 13, 33, 36, 37.)  In fact, it is the

14   design and format of the ISOTs that is arguably one of the most deceiving aspects of the offers

15   since many consumers may not even realize the "quiz" or "IQ test" they are taking is part of some

16   third party marketing program—from the consumer's perspective, the quiz is part of a transaction

17   for Zynga virtual currency.  (*See* Ex. 1, 3 to Plaintiff's Request for Judicial Notice.)  The ISOTs

18   are thus directly integrated into Zynga's games.

19        Moreover, in addition to demonstrating that Zynga is responsible for creating the content

20   of the ISOTs, Plaintiff has undoubtedly demonstrated Zynga's "material contribution" to the

21   alleged unlawful activity.  Specifically, the FAC alleges that Zynga designed its games to

22   intentionally create the demand for the virtual currency offered in those games and then used this

23   demand to lure consumers into fraudulent ISOT transactions.  In fact, by offering free virtual

24   currency to consumers who participate in ISOTs, Zynga is actually a party to the fraudulent

25   transactions that are the subject of this case—it is Zynga, not any third party, which actually

26   provided the virtual currency that led consumers to complete ISOTs.  There is no doubt that,

27   using the language of the Ninth Circuit, Zynga's active and direct involvement "substantially

28   enhanced" the fraudulent ISOTs.  *Roomates.Com*, 521 F.3d at 1172.

-15-

If there was any doubt as to Zynga's "material contribution" to this scheme or the fact that it is "responsible" for the offending content, one only need look at the public statements of Zynga's own CEO, Mark Pincus.  In a recent speech, Pincus admitted Zynga's "responsibility" when he described the reasons why Zynga presented misleading ISOTs .:

> "… I needed the revenue now.  So, so **I funded the company myself but I did**
> **every horrible thing in the book to just get revenues right away.**  I mean we
> gave our users poker chips if they downloaded this wiki toolbar, which was like . .
> . I don't know.  I downloaded it once and I couldn't get rid of it.  **We did anything**
> **possible to just get revenues so that we could grow and be a real business.**"
> (Emphasis added.)

(FAC ¶ 16.)

In making these statements, Mr. Pincus explicitly admits that Zynga, not a third party, "did every horrible thing."  Moreover, within days after these admissions were made public on the internet, Zynga announced that it was removing *all* ISOTs from its games because they "did not provide value" to consumers – a decisions which Pincus described as "the right thing" to do.  Here, again, the plain language of Mr. Pincus's statements refers to **Zynga's** previous failure "to do the right thing," not to any failure by any third party.  Zynga is no innocent victim of "third party" conduct; quite the contrary, Zynga's own admissions acknowledge the company's direct involvement and material contribution to the illegal conduct that is the subject of this action.

### B.   None of The Cases Cited By Defendants Even Approaches The Type of Direct Involvement and "Material Contribution" Alleged in The Complaint.

To support its position that it is entitled to CDA immunity, Zynga relies heavily on the district court's decision in *Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D. Cal. 2009).  However, an examination of *Goddard* demonstrates that the situation there is entirely different from the facts alleged in this case.

In *Goddard*, the court found that Google was entitled to CDA immunity in connection with fraudulent advertisements appearing on its search engine.  *Id.* at 1199.  In that case, Google allowed companies that sold cell phone ring tones to post allegedly misleading ads on Google's

-16-

search engine.  *Id.* at 1194.  The ring tone advertisements would only appear when certain keywords were entered into the search engine by consumers.  *Id.* at 1197.  The advertisers could select which keywords they wanted to associate with their advertisements, and Google provided them with a keyword suggestion tool to help them identify possible keywords.  The *only* contribution to the ads that Plaintiff could point to was Google's keyword suggestion tool.  *Id.* Plaintiff alleged that by allowing advertisers to utilize this tool, Google had been transformed into an "information content provider" that was not entitled to CDA immunity.  *Id.*

The district court determined that Google could not be held responsible for merely publishing the fraudulent advertisements on its search engine.  *Goddard*, 640 F.Supp.2d at 1198. Relying on *Roomates.Com* the court found that Google did not "materially contribute to" or "enhance" the false advertising at issue.  *Id.*  The court reasoned that since Google provided a neutral tool that merely "suggested" key words that could be used by advertisers, those suggestions did not constitute a sufficient contribution to the ads to bring Google within the definition of a "content provider."  *Id.*

Here, the situation is entirely different.  Zynga is not a neutral website that is merely allowing random third parties to post ads.  Rather, Zynga is a direct participant in the fraudulent transactions that are the subject of this case.  (FAC ¶¶ 32, 33, 34.)  Zynga created the games that allow the ISOTs to prosper and in which the ISOTs appear.  (*Id.*)  Zynga lured consumers to the ISOTs by offering them free virtual currency.  (FAC ¶¶ 6-9.)  Zynga is responsible for the design, format, and appearance of the ISOTs within the virtual marketplaces that it owns and controls. (*Id.*)  Zynga is responsible for the text in the ISOTs which indicates that consumers will receive free virtual currency for participating in the ISOT as well as the large buttons that direct consumers to the transactions.  (*Id.*, Ex. 3 to Plaintiff's Request for Judicial Notice.)  Zynga is also responsible for designing the ISOTs so that participating consumers may not realize they are participating in a third party scam.  (*Id.*)  Finally, when consumers are defrauded by the ISOTs, Zynga receives a share of the proceeds.  (FAC ¶ 8.)  These facts differ sharply from a search engine which passively allows others to display advertisements on its site.

Additionally, none of the other cases cited by defendants comes even close to the direct

-17-

and material involvement alleged here.  For example, in *Green v. America Online*, 318 F.3d 465

(3d Cir. 2003), AOL was held immune for derogatory comments and malicious software

transmitted by other defendants through AOL's "Romance over 30" "chat room."  There was no

allegation that AOL solicited the content, encouraged users to post harmful content or otherwise

had any involvement whatsoever with the harmful content, other than through providing "chat

rooms" for general use.  *Id.* at 469.

In *Ben Ezra, Weinstein, and Co. v. America Online Inc.,* 206 F.3d 980 (10th Cir. 2000),

the court held AOL immune for relaying inaccurate stock price information it received from other

vendors.  While AOL undoubtedly participated in the decision to make stock quotations available

to members, it did not cause the errors in the stock data, nor did it encourage or solicit others to

provide inaccurate data.  *Id.* at 984-85.  AOL was immune because "Plaintiff could not identify

any evidence indicating Defendant [AOL] developed or created the stock quotation information."

*Id.* at 985 n.5.

In *Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir. 1997), the court held AOL

immune for yet another set of defamatory and harassing message board postings.  Again, AOL

did not solicit the harassing content, did not encourage others to post it, and had nothing to do

with its creation other than through AOL's role as the provider of a generic message board for

general discussions.  *Id.* at 328-29.

Finally, in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2002), the court found a website

operator that allegedly posted defamatory e-mail immune under the CDA.  However, in that case

the website operator did "no more than select and make minor alterations" to the emails submitted

to his site.  *Id.* at 1031.

All of these cases are distinguishable from the situation presented here.  In this case,

Zynga's involvement in the fraudulent transactions is direct, material, and substantial.

**VI.     THE CDA DOES NOT GRANT IMMUNITY FOR VIOLATIONS OF FEDERAL WIRE FRAUD STATUTES**

Section (e)(1) of the CDA provides that none of the provisions of the CDA shall be

"construed to impair the enforcement of . . . any  . . . Federal criminal statute."  47 U.S.C.A. §

-18-

230(e)(1).

Here, Plaintiff's First Cause of Action alleges that Zynga's conduct constitutes an "unlawful" business practice in violation of California Business and Professions Code Section 17200 (the "UCL") in that its conduct violates federal wire and mail fraud statutes 18 U.S.C.A. §§ 1341 and 1343.  It is well settled that the violation of federal wire and mail fraud statutes may serve as a predicate "unlawful" act in violation of the UCL.  *See Roskind v. Morgan Stanley Dean Witter & Co*., 80 Cal.App.4th 345, 354 (2000) ("Mail fraud under federal law, is actionable under the UCL, which borrows other law, including federal law, to define the 'unlawful' practices that are UCl violations").

The essential elements of mail fraud under section 1341 and wire fraud under section 1343 are: (1) the formation of a scheme or artifice to defraud; and (2) use of the mails or interstate communications wires in furtherance of the scheme.  *United States v. Bohonus*, 628 F.2d 1167, 1171 n. 7 (9th Cir.).  Under the first element, Plaintiff must show that the scheme which is the subject of the action was reasonably calculated to deceive persons of ordinary prudence and comprehension.  *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir.1984); *Bohonus*, 628 F.2d at 1172.  The intent to defraud is shown by examining the scheme itself.  *Bohonus*, 628 F.2d at 1172.  The fraudulent scheme need not be one that includes an affirmative misrepresentation of fact, since it is only necessary to prove that the scheme was calculated to deceive "persons of ordinary prudence."  *Id.* at 1173.

Additionally, courts have found that a violation of the federal wire fraud statutes do not require a showing of reliance or damages.  *See Virden v. Graphics One*, 623 F.Supp. 1417, 1423 (1985).

Here, Plaintiff has adequately alleged a violation of the Federal wire and mail fraud statutes.  Specifically, the FAC alleges that Zynga engaged in a scheme designed to steal funds from consumers and that it do so through the use of "interstate communication wires;" the internet.  (FAC ¶¶ 1, 14, 55.)  The FAC further alleges a specific intent on the part of Zynga to engage in this scheme.  (FAC ¶¶ 16, 19, 32.)  In fact, the FAC expressly quotes Zynga's CEO, Mark Pincus wherein he expressly admits his company's active involvement in the scheme and its

-19-

motive for doing so.  (FAC ¶¶ 16, 19.)  Because the CDA does not provide immunity from wire and mail fraud, Plaintiff's UCL claims must stand.

## VII.    PLAINTIFF HAS PLED HER CLAIMS WITH SUFFICIENT PARTICULARITY

Zynga relies almost exclusively on *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009), and provides a sparse, incomplete description of Plaintiff's allegations, to argue that her allegations fail to meet the specificity required under Fed. R. Civ. P. 9(b) ("Rule 9(b)").  (Mot. at 22-25.)  However, Plaintiff's allegations do not suffer from the defects described in *Kearns*.  The FAC more than adequately alleges the specifics of the misconduct that underlie Plaintiff's claims.

The specificity requirements under Rule 9(b) "must be read in harmony with Federal Rule of Civil Procedure 8's requirement of a 'short and plain' statement of the claim.  Thus, the particularity requirement is satisfied if the complaint 'identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.'"  *Baas v. Dollar Tree Stores, Inc.*, No. C 07-03108 JSW, 2007 U.S. Dist. LEXIS 65979, at *5 (N.D. Cal. Aug. 29, 2007) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989)).  Moreover, Plaintiff's allegations of fraudulent conduct satisfy Rule 9(b) if they are "'specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'"  *Rand v. Am. Nat'l Ins. Co.*, No. C 09-0639 SI, 2009 U.S. Dist. LEXIS 64781, at *15 (N.D. Cal. July 28, 2009) (quoting *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993)).

### A.    Plaintiff Is Not Required To Plead Each Element of Fraud Because Fraud Is Not A Cause of Action In Her Complaint.

As an initial matter, Zynga incorrectly argues that *Kearns* held that each of the elements of fraud must be pled for Rule 9(b) to be satisfied.  (Mot. at 23 ("the complaint [in *Kearns*] failed for not pleading with specificity each of the elements of fraud.").)  However, the court in *Kearns* merely discussed the elements of fraud under California law to assist the court in determining whether Rule 9(b) should be applied and whether certain allegations must be pled with particularity, not to prescribe requirements for satisfying Rule 9(b).

Specifically, the plaintiff in *Kearns* argued that Rule 9(b) did not apply in part because his

-20-

"failure to disclose" claims were not "grounded in fraud." *Kearns*, 567 F.3d at 1125-26.  After describing the elements of fraud under California law, the court held that "nondisclosure" was an element of fraud and that allegations of nondisclosure "must be pleaded with particularity under Rule 9(b)."  However, the court did not separately analyze whether each of the elements for fraud was pled with particularity to determine whether Rule 9(b) was satisfied or find that each element of the claims had to be pled with particularity.  *See*, *e.g.*, *FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 U.S. Dist. LEXIS 15016, at *7 (N.D. Cal. Feb. 22, 2010) ("[C]ourts in this circuit have required heightened pleading even where a plaintiff neither needed to prove nor alleged all elements of common law fraud.") (citations omitted); *see also VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073, 1085-86 (E.D. Cal. 2009) (finding that Rule 9(b) applied and that plaintiff's UCL claims were pled with sufficient particularity under Rule 9(b) without analyzing each of the elements of fraud).

Plaintiff has not pled a cause of action for fraud and numerous courts have held that fraud is not coextensive with the fraudulent prong of the UCL.  As a result, while Plaintiff's allegations "sound in fraud," it is not necessary to satisfy each element of fraud to state a claim under the UCL.  Rather, plaintiff is merely required to plead the elements of a UCL claim which only requires proof that a defendant has engaged in a business practice that its "likely to deceive the public."  *See*, *e.g.*, *Gruen v. Edfund*, No. C 09-00644 JSW, 2009 U.S. Dist. LEXIS 60396, at *14 (N.D. Cal. July 15, 2009) ("[P]leading a claim under the fraudulent prong of Section 17200 is not the same as pleading common law fraud; '[S]ection 17200 does not require a plaintiff to plead all of the elements of fraud.'") (quoting *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1118 (C.D. Cal. 2008)); *see also Marcelos v. Dominguez*, No. C 08-00056 WHA, 2008 U.S. Dist. LEXIS 91155, at *32 (N.D. Cal. July 18, 2008) (holding that fraudulent conduct under Section 17200 is "defined more broadly than common law fraud and only requires a showing that 'members of the public are likely to be deceived.'") (citation omitted).

**B.**   **Plaintiff's Complaint Pleads Sufficient Facts To Show That Defendant Engaged In A Business Practice That Was "Likely to Deceive The Public."**

In this case, Zynga does not specifically delineate which aspects of the "who, what, when,

-21-

where and how" are purportedly not satisfied by the FAC.  Zynga appears to take issue with whether Plaintiff has pled with specificity "what" and "how" the alleged conduct was misleading and deceptive, and whether Plaintiff particularly alleged Zynga's role in developing, funding and creating the advertisements.  Indeed, Zynga does not, and cannot, contend that Plaintiff has failed to explain "when" the fraudulent conduct was committed and "where" the fraudulent conduct occurred.  For example, the FAC expressly alleges that Plaintiff incurred charges on April 16, 2009 after receiving a texted "code" that could be used for virtual currency.  (*Id.*)  In addition, Plaintiff indicates that she participated in a "risk-free Green Tea Purity Trial" ISOT on June 14, 2009, asked to cancel her order for green tea supplements on June 24, 2009, was emailed regarding charges for the product on July 4, 2009 and was charged for the product on July 6, 2009 and July 20, 2009.  (*Id.* at ¶¶ 38-40.)  Moreover, Plaintiff describes the specific games and websites in which the allegedly deceptive and misleading ISOTs appeared.  Plaintiff alleges that the ISOTs are incorporated into game applications such as Mafia Wars, FarmVille and YoVille! that users play on social networking websites such as Facebook and MySpace.  (*See, e.g.*, *id.* at ¶¶ 1, 3-4, 8-9, 12-14, 16-17, 25, 31, 33, 36-38, 40-41, 45, 54.)

Amazingly, Zynga also argues that Plaintiff "fail[ed] to state anything that Zynga actually did related to the ads at issue." (Mot. at 25.)  Apparently, Zynga failed to read the majority of Plaintiff's FAC. Plaintiff repeatedly and specifically alleges that *Zynga*, *Adknowledge* and *KITN* provided (FAC ¶ 6), funded (*id.* at ¶ 7), created and developed (*id.* at ¶ 8) the allegedly deceptive and misleading ISOTs.  The FAC further alleges that "The ISOTs created and developed by *Defendants* are highly misleading and often result in users subscribing to goods or services that they do not want or need." (*Id.* at ¶ 34 (emphasis added); *see also id.* at ¶¶ 36-38, 41, 45, 52-56, 63-66, 69.)  Plaintiff has also stated that ISOTs created, designed, funded and promoted by *Zynga* interfaced with *Zynga* games.  (*See, e.g.*, *id.* at ¶¶ 6-9, 11-15.)  Furthermore, Plaintiff expressly alleges that she participated in an ISOT "created and developed by *Zynga* and *Super Rewards*" in April 2009.  (*Id.* at ¶ 37 (emphasis added).)  To be sure, the FAC indicates that *Zynga's CEO* admitted that the ISOTs *it* designed and promoted mislead users, were designed to mislead consumers and were "taking advantage of Zynga's users, . . . ." (*Id.* at ¶ 20; *see also id.* at ¶¶16-

-22-

1   19.)

2       Plaintiff has also specifically described "what" and "how" Defendants' ISOT scheme was

3   misleading and deceptive to the public.  Zynga argues that Plaintiff has not alleged specific

4   misrepresentations that she relied upon (Mot. at 24), whether "Zynga supposedly knew the third-

5   party ads were false, or what Zynga did to encourage Swift to accept the particular ads at issue, as

6   opposed to ads generally."  (Mot. at 23.)  Zynga also claims that, for one of the ads described in

7   the FAC, it cannot tell what offer Plaintiff believed she was signing up for and what she thought

8   "would happen when she entered her cell phone number."  (Mot. at 23.)

9        As an initial matter, Courts have held that knowledge of falsity (scienter), intent and

10  "other conditions of a person's mind may be alleged generally," *Marcelos*, 2008 U.S. Dist.

11  LEXIS 91155, at *16; *see also Keilholtz v. Superior Fireplace Co.*, No. C 08-00836 CW, 2009

12  U.S. Dist. LEXIS 30732, at *14 (N.D. Cal. Mar. 30, 2009).  Furthermore, at least one post-

13  *Kearns* decision has held that where claims are based on fraudulent omissions, "the Rule 9(b)

14  standard is relaxed because "'a plaintiff cannot plead either the specific time of [an] omission or

15  the place, as he is not alleging an act, but a failure to act.'"  *Cirulli v. Hyundai Motor Am.*, No.

16  SACV 08-0854 AG (MLGx), 2009 U.S. Dist. LEXIS 125139, at *11 (C.D. Cal. June 12, 2009)

17  (citation omitted).

18      Despite the fact that Plaintiff is not required to plead knowledge and intent specifically,

19  she has clearly done so in the FAC.  The FAC describes the misleading and deceptive ISOT

20  transactions in detail, including the specific misrepresentations or omissions upon which Plaintiff

21  and other putative class members relied.  In fact, the FAC actually contains a link to a video

22  where the fraudulent ISOTs are depicted in detail.  (*See* Ex. 1 to Plaintiff's Request for Judicial

23  Notice.)

24      In addition, the FAC alleges that Zynga knew its advertisements were false by quoting

25  Zynga's CEO, who admitted that the ISOTs were "**designed to mislead** consumers and generate

26  increasing revenues for its business."  (*Id.* at ¶ 16 (emphasis added).)  Mr. Pincus stated that he

27  raised revenue for Zynga by "'[doing] every horrible thing in the book . . . We did anything

28  possible to just get revenues so that we could grow and be a real business.'"  (*Id.* (emphasis

-23-

1  omitted).)  Mr. Pincus also suggested that Zynga's ISOTs did not "offer clear user value" and that

2  Zynga engaged in such practices so that his company could eventually "do the right thing and

3  make the long-term decisions like, get rid of all offers."  (*Id.* at ¶ 19 (emphasis omitted).)  As a

4  result, Zynga has "*known* for some time that the ISOTs were" designed and promoted to "tak[e]

5  advantage of Zynga's users, . . . ."  (*Id.* at ¶ 20 (emphasis added); *see also id.* at ¶¶ 41 ("At all

6  times, Zynga . . . [was] aware, or should have been aware, of the false and deceptive nature of the

7  ISOTs they presented to Plaintiff.").)

8  ## VIII.  CONCLUSION

9         Zynga is not immune from liability under the CDA as a matter of law, and the allegations

10  of Plaintiff's complaint state a plausible theory of Zynga's liability and the basis for Plaintiff's

11  right to relief.  Accordingly, Zynga's motion should be denied.  In the alternative, Plaintiff

12  respectfully requests leave to amend in the alternative to denying Zynga's motion in full.

13  Dated: June 8, 2010.                    KERSHAW, CUTTER & RATINOFF LLP

14

15                                          By _____
16                                             STUART C. TALLEY

17                                          Stuart C. Talley
                                            William A. Kershaw
18                                          C. Brooks Cutter
                                            John R. Parker, Jr.
19                                          **KERSHAW, CUTTER & RATINOFF LLP**
                                            401 Watt Avenue
20                                          Sacramento, California  95864
                                            Telephone: (916) 448-9800
21                                          Facsimile: (916) 669-4499

22                                          Mark J. Tamblyn
                                            Ian J. Barlow
23                                          **WEXLER WALLACE LLP**
                                            455 Capitol Mall, Suite 231
24                                          Sacramento, California 95814
                                            Telephone:  (916) 492-1100
25                                          Facsimile:  (916) 492-1124

26                                          Attorneys for Plaintiff

27

28