Richard L. Seabolt (SBN 67469)
Suzanne R. Fogarty (SBN 154319)
Oliver E. Benn (SBN 244618)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415.957.3000
Facsimile: 415.957.3001
E-mail: RLSeabolt@DuaneMorris.com
SRFogarty@DuaneMorris.com
OBenn@DuaneMorris.com

Attorneys for Defendant,
ZYNGA GAME NETWORK INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA SWIFT, individually, on behalf of the general public, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZYNGA GAME NETWORK INC.; ADKNOWLEDGE, INC.; D/B/A SUPER REWARDS; KITN MEDIA USA, INC., D/B/A SUPER REWARDS;<br><br>Defendants. | Case No.: CV 09-5443 SBA<br><br>**REPLY BRIEF OF ZYNGA GAME NETWORK INC.**<br><br>Date: June 29, 2010<br>Time: 1:00 p.m.<br>Judge: Hon. Saundra B. Armstrong<br>Ctrm.: 1<br><br>Complaint Filed: November 17, 2009 |

**TABLE OF CONTENTS**

Page

I. Introduction ................................................................................................................1

II. The *Facts* That Swift Alleges Make Clear That Zynga Created Nothing More Than An Advertising Platform To Monetize Its Games – What Swift Describes As ISOTs Are In Fact Part Of A Common Business Model On The Internet ........................................3

III. The CDA Immunizes Zynga As An Interactive Computer Service That Had No Role In The Creation or Development of the Offending Content ...........................................5

    1. The Scope of CDA Section 230 Is Clear. ...................................................5

    2. Swift Does Not Dispute That Zynga Is A Provider Or User Of An Interactive Computer Service. ........................................................................................6

    3. Swift's Suit Treats Zynga As A Publisher Of Allegedly Unlawful Content. ..........6

        a. At Bottom, Swift's Claim Is That Zynga Hosted Content That Caused Her Harm ........6

        b. Swift's Citations Support Zynga's Position Rather Than Her Own .........................9

    4. Zynga Did Not Create Or Develop The Content That Caused Swift's Alleged Harm. .........10

IV. Swift Is Not "Enforcing" Federal Wire Fraud Statutes ...............................................13

V. In the Alternative, Swift's Claims Cannot Survive a Motion To Dismiss Because She Has Not Identified Sufficient Facts Of Zynga's Alleged Fraudulent Conduct ...........14

VI. Even If The Court Were To Believe This To Be A Close Call, It Must Grant The Motion To Dismiss .................................................................................................................14

VII. Conclusion .................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*800-JR Cigar v. GoTo.com*, 437 F.Supp.2d 273 (D.N.J. 2006) .................................................. 10

*Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009) .............................................................. 5, 7-9

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ...................................................................... 1, 5

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) ............................................................. 8

*Carafano v. Metrosplash*, 339 F.3d 1119 (9th Cir. 2003) ....................................................... 1, 5

*F.T.C. v. Accusearch Inc.* 570 F.3d 1187 (10th Cir. 2009) .................................................... 9-10

*Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*
  ("*Roommate.com*"), 521 F.3d 1157 (9th Cir. 2008) ............................... 1, 8, 11-12, 15

*Gentry v. eBay*, 99 Cal.App.4th 816 (2002) ................................................................................ 8

*Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D.Cal. 2008) ("*Goddard I*") .................... 8, 14

*Goddard v. Google, Inc.*
  640 F.Supp.2d 1193 (N.D.Cal. 2009) ("*Goddard II*") ................... 1-2, 6, 8, 11-13, 15

*Gruen v. EdFund*, 2009 WL 2136785, 2009 U.S. Dist. Lexis 60396 (N.D.Cal. 2009) ............. 14

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ....................................................... 14

*Mazur v. eBay Inc.*, 2008 WL 618988 (N.D.Cal. 2008) ............................................................ 10

*Nemet Chevrolet, Ltd. V. Consumeraffirs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) .................. 11

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................................ 14

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ..................................................... 8

**Federal Statutes and Rules of Court**

18 U.S.C. §§ 1341, 1343 ............................................................................................................ 14

18 U.S.C. § 1957 ........................................................................................................................ 13

47 U.S.C. § 230(b)(1)-(2) ............................................................................................................ 5

47 U.S.C. § 230(b)(5) ................................................................................................................. 13

47 U.S.C. § 230(c)(1) ................................................................................................................ 5-6

47 U.S.C. § 230(e)(1) .............................................................................................................. 3, 13

47 U.S.C. § 230(e)(1)-(2),(4) .................................................................................................... 13

Zynga -- Reply Brief re: Motion to Dismiss First Amended Complaint
CV 09-5443 SBA

## I. Introduction

Congress, the Ninth Circuit, this Court and other courts across the country consistently have immunized providers of interactive computer services when, as here, offensive or unlawful material that originated from a third party is made available on or through the service provider's website. *Batzel v. Smith*, 333 F.3d 1018, 1020 (9th Cir. 2003) ("Congress ... has chosen for policy reasons to immunize 'providers and users of interactive computer services' when [the offending] material is 'provided' by someone else."); *Carafano v. Metrosplash*, 339 F.3d 1119, 1124-25 (9th Cir. 2003) (applying immunity where the content of a dating profile was left exclusively to the user).

A website operator, such as Zynga, that provides a platform that can be used for proper purposes, as well as for unlawful or illegal purposes, retains its immunity "so long as it does not require" that its users or advertisers post unlawful content. *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC* ("*Roommate.com*"), 521 F.3d 1157, 1169 (9th Cir. 2008). The test is not whether the website operator failed to monitor its site for offensive content or whether it provided a vehicle through which offensive content could be made available (*Id.* at 1174, n. 38), but whether "the website directly participates in developing the alleged illegality" (*Id.* at 1174).

As Judge Fogel held in *Goddard v. Google, Inc.*, 640 F.Supp.2d 1193 (N.D.Cal. 2009) ("*Goddard II*"), no matter how "artful [the] pleading," the claims must fail when they seek to hold providers of online services liable for content created or developed by others. *Id.* at 1195. Moreover, the Ninth Circuit has recognized that Section 230, as an immunity statute, "must be interpreted to protect websites not merely from liability, but from having to fight costly and protracted legal battles." *Roommate.com*, 521 F.3d at 1174,1175.

Here, the case dispositive question is whether Zynga "created or developed" the allegedly "offensive content" about which Swift complains – or, whether Zynga merely provided a platform on which allegedly offensive ads or links appeared. When Swift's flamboyant hyperbole is stripped away, there is nothing from which this Court can conclude that Zynga "created or developed" the "offending content" that Swift claims caused her alleged harm. This case involves third-party content. Zynga had no role whatsoever in the creation of development of that content.

1

In fact, Swift's own elaboration on the allegations of her First Amended Complaint (FAC) firmly establishes that Zynga did not create or develop the offending content about which Swift complains. Swift attaches as Exhibit 3 to her Request for Judicial Notice a screen capture of an "offerwall." Notably she does not allege that screen capture contains the content that she claims misled her. She also does not allege – and consistent with Rule 11 cannot allege – that the content of Exhibit 3 was in any way "created or developed" by Zynga. Moreover, she does not allege that any part of Exhibit 3 is the "offending content." The offerwall indicates that coins would be awarded. Swift does not claim that any coins that were promised were not provided. Rather, Swift's claim relates to the content of third-party websites, which she acknowledges in a brief flash of candor are "third parties" – allegedly "disreputable third parties," who are at least one to two steps removed from Zynga. *See,* Swift Opposition to Zynga Motion to Dismiss 5:26.

The only identifiable *facts* alleged in the complaint, as opposed to conclusions, are: (1) Zynga created social games that were completely free to play, but which Zynga also sought to monetize; (2) one way it monetized them was by creating a platform for third-party advertisers, and that platform allowed those advertisers to give rewards to users who completed their offers, by buying those users some virtual currency; (3) Swift allegedly responded to two advertising offers from third parties who took Swift's money and then failed to do what they allegedly said they would do; and (4) Zynga CEO Mark Pincus once said that when he founded the company in 2007 he initially did "everything horrible thing in the book to get revenue" describing as an example allowing a third-party advertiser to provide rewards in exchange for installing a toolbar that was difficult to uninstall.

Those alleged facts do not state a claim upon which relief can be granted against Zynga. The CDA immunizes Zynga from any common law liability that would otherwise attach for permitting third-party content to appear on its platform. All of Swift's claims against Zynga are based on typical acts of a website host -- Zynga hosts and profits from advertising – the same acts and claims that Judge Fogel rejected in *Goddard v. Google*.

Because Swift's allegations must be treated as true for purposes of this motion, Zynga does not contest here that some advertisers could have presented some inappropriate third-party ads

2

through Zynga's platform where the advertiser's ads either did not sufficiently disclose a feature of the offer (automatic renewal) or promised something (a refund pursuant to a money-back guarantee) that the advertiser later failed to fulfill. But the only "conduct" attributed to Zynga – creating games that allow entertainment and interaction with friends; designing a platform through which third parties may advertise; deriving revenues from those third-party ads; allowing those advertisers to reward users who patronize them – is entirely lawful and happens every day.

Additionally, Swift makes the patently incorrect argument that she falls within an exception to the CDA that applies only to "**the enforcement of** . . . any . . . Federal criminal statute." 47 U.S.C. § 230(e)(1). Rebecca Swift is not seeking to enforce any federal criminal statutes; rather, she is seeking monetary damages under California's Unfair Competition Law.

Finally, Swift simply has not plead with sufficient particularity any of her claims. Although she is required to set out the "who, what, when, where, how" of her misrepresentation/fraud claims, she still has not pled with particularity what she was told and where and by whom she was told that which she contends was false or misleading. No copy of the third party website is attached to the FAC. As a result, the FAC is opaque with respect to the most basic aspects of her claim, such as (1) which third party website was involved, (2) whether there was a disclosure that she claims was misleading because it was in small print, and (3) how the website conveyed the requirement for a credit card, debit card or cell phone number.

II. **The *Facts* That Swift Alleges Make Clear That Zynga Created Nothing More Than An Advertising Platform To Monetize Its Games – What Swift Describes As ISOTs Are In Fact Part Of A Common Business Model On The Internet**

Swift invents the term "ISOTs," a term that produces no Google search results for the entire internet, in an effort to try to create the fiction that the third-party websites or the links to them are "integrated" into Zynga's game websites in some unusual or nefarious manner that destroys Zynga's CDA immunity. Opp. to Adknowledge Mot. at 1. The reality, as revealed by the *facts* Swift herself alleges, is significantly more mundane.

Zynga's business model is a common and accepted one for Internet businesses called the "Freemium" model, where the majority of users engage in the basic service for free, but some users

3

Zynga – Reply Brief re: Motion to Dismiss First Amended Complaint
CV 09-5443 SBA

decide to pay for more advanced features. Compl., ¶¶ 2, 4, 6, 32.[1] Zynga's millions of users play its games for free, but those who want to unlock special features or advance more quickly in the games need to acquire virtual currency by completing in-game tasks or buying virtual currency. Compl., ¶¶ 2, 4, 6, 32. In addition, if users completed offers from third-party advertisers, the advertisers could reward the users by buying some virtual currency for them. Compl., ¶ 8.

The Swift-created acronym, ISOT, refers to nothing more than third-party ads being made available through an advertising platform that Zynga designed so that companies like Netflix could invite users to try their service in exchange for some virtual currency. Compl., ¶ 8; *see also* Kim, Ryan, *Tapping into growing market for virtual goods*, SAN FRANCISCO CHRONICLE, Nov. 2, 2009 at D1 (http://articles.sfgate.com/2009-11-02/business/17179650_1_virtual-goods-social-networks-social-networking-sites) (describing how Zynga users receive in-game cash in exchange for a Netflix membership); Torrance, Kelly Jane, *FarmVille turning hipsters into farmers*, WASHINGTON TIMES, Oct. 16, 2009 (http://www.washingtontimes.com/news/2009/oct/16/online-game-farmville-turning-hipsters-farmers) (same).

Zynga does not contest here that some improper third-party ads could have been made available through its platform, just as they have appeared on or through numerous other websites across the internet. The "horrible things" remark from Zynga's CEO Mark Pincus, which Swift talismanically repeats – *seven times* – in her opposition, simply reflects a recognition that there were some improper ads. Pincus stated that he clicked on a third-party ad in a Zynga game and ultimately installed a Zwinky toolbar on his computer that was hard to remove. Pincus characterized that as a "horrible thing" even though such experiences have also occurred on many well-established sites,

---

[1] See also Wyld, David, The Utility Of Cloud Computing As A New Pricing – And Consumption - Model For Information Technology, Int'l J. Database Mgmt Systems, Nov. 2009, at 10 (http://airccse.org/journal/ijdms/1011s1.pdf) (describing "freemium" as "a free version that is supported by a paid, premium version" and observing that the freemium business model is "particularly popular among online service and software companies"); Anderson, Chris, The Economics of Giving It Away, WALL STREET JOURNAL, Jan. 31, 2009 at W1(http://online.wsj.com/article/SB123335678420235003.html) (same); Grose, Thomas K., One Drip at a Time, TIME MAGAZINE, Jun. 22, 2009 (http://www.time.com/time/magazine/article/0,9171,1903990,00.html) ("[T]he trend [in online social games] is the free-to-play, or 'freemium model.'").

4

such as Google and Yahoo! But the fact that Pincus thought this was a "horrible thing" does not allow Swift to create a conspiracy out of thin air and does not change the CDA analysis. The CDA provides immunity so long as the content was created and developed by a third party.

### III. The CDA Immunizes Zynga As An Interactive Computer Service That Had No Role In The Creation or Development of the Offending Content

#### 1. The Scope of CDA Section 230 Is Clear.

Plaintiff initially argues, based on an unpublished New York state case decided before Section 230 was enacted, that the statute's immunity provision protects only service providers who affirmatively monitor third-party content that appears on their services. (Opp. at 7.) The Ninth Circuit has *repeatedly* rejected this argument and refused to engage in an "academic debate" regarding the earliest, pre-enactment objectives of Congress with respect to Section 230. *Barnes v. Yahoo!*, 570 F.3d 1096, 1104-1105 (9th Cir. 2009); *Batzel v. Smith*, 333 F.3d 1018, 1027 fn. 10 (9th Cir. 2003). As *Barnes* observed:

> Nor do we find particularly edifying the debate over the exact reach of *Stratton Oakmont*, the New York case Congress apparently meant to overrule . . . Both parties make a lot of sound and fury on the congressional intent of the immunity under section 230, but such noise ultimately signifies nothing. **It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language.** (570 F.3d at 1105 (emphasis added).)

As discussed in Zynga's opening brief (pp. 7-9), Congress' own words explain that it wanted "to promote the continued development of the Internet" and "to preserve the vibrant and competitive free market that presently exists for the Internet." 47 U.S.C. § 230(b)(1)-(2); *see also Batzel*, 333 F.3d at 1027 ("Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce.").

While Swift attempts to artificially limit the CDA to fit her theories, there are only three requirements for CDA immunity to apply, and it is clear from the face of the amended complaint that Zynga meets all three. Zynga is immune from liability under Section 230 because: (1) Zynga is "a provider or user of an interactive computer service;" (2) Swift's claims seek to treat Zynga as a publisher or speaker; and, (3) the false and misleading content about which Swift is complaining is "information provided by another information content provider." 47 U.S.C. § 230(c)(1); *Carafano*

*v. Metrosplash*, 339 F.3d 1119, 1123 (9th Cir. 2003).[2] These are discussed in turn.

### 2. Swift Does Not Dispute That Zynga Is A Provider Or User Of An Interactive Computer Service.

In their respective opening briefs, Zynga and Defendant Adknowledge each argued that they are "a provider or user of an interactive computer service." Zynga Mot. at 10-11; Adknowledge Mot. at 9-10. While Swift's opposition to Adknowledge's motion to dismiss disputes Adknowledge's status as a provider or user of an interactive computer service (Opp. to Adknowledge Mot. at p. 8), Swift conspicuously makes no such argument as to Zynga. Nor can it, because Zynga clearly is a provider of an interactive computer service. Therefore, Zynga fulfills the first prong required for CDA immunity.

### 3. Swift's Suit Treats Zynga As A Publisher Of Allegedly Unlawful Content.

#### a. At Bottom, Swift's Claim Is That Zynga Hosted Content That Caused Her Harm.

Swift's attempts to reframe the basic nature of her claims against Zynga get her nowhere. Other plaintiffs in similar cases have tried to avoid the CDA's protections by asserting that their claims arise from a website operator's affirmative "conduct" rather than the mere display, or "hosting" of information. These efforts have repeatedly failed.

A provider of an interactive computer service receives immunity from claims that seek to "treat" the provider "as the publisher or speaker" of any third-party content. 47 U.S.C. § 230(c)(1).

---

[2] In fact, Plaintiff's newly appointed co-counsel, Benjamin Edelman, has publicly admitted that, while he does not personally agree with the policy choices that Congress made in Section 230, the statute's immunity defeats claims such as Swift's. In a 2006 article discussing the exact same type of Google Adwords advertisements that would later become the subject of the *Goddard v. Google* case, Edelman wrote as follows:

> Nonetheless, the **Communications Decency Act's 47 USC § 230(c)(1) potentially offers Google a remarkable protection**: CDA § 230 instructs that Google, as a provider of an interactive computer service, may not be treated as the publisher of content others provide through that service. **Even if a printed publication would face liability for printing the same ads Google shows, CDA § 230 may let Google distribute such ads online with impunity**. From my perspective, that would be an improper result -- bad policy in CDA § 230's overbroad grant of immunity. A 2000 DOJ study seems to share my view, specifically concluding that "substantive regulation ... should, as a rule, apply in the same way to conduct in the cyberworld as it does to conduct in the physical world." **But in CDA § 230, Congress seems to have chosen a different approach.** (http://www.BenEdelman.org/ppc-scams.) (emphasis added).

As discussed in Zynga's opening brief (pp. 11-14), the Ninth Circuit recognizes that this immunity applies to *any* cause of action where liability is premised on a decision to permit or refuse to permit third-party content to appear within its services. *Barnes*, 570 F.3d at 1101-1102. This includes decisions (or omissions) regarding either editorial or advertising third-party content. *Id.* at 1101 (citing "negligent publication of advertisements that cause harm to third parties" as an example of a cause of action treating a defendant as a "publisher or speaker" and hence immunized from common law liability).

In her opposition, Swift tries *again* to reframe her claims against Zynga, arguing they do not treat Zynga as a publisher and instead focus on some supposedly independent conduct on the part of Zynga. This is the second time she has attempted to recharacterize her claims to avoid CDA immunity. In her original complaint, Swift candidly sought to hold Zynga liable for, in her words, having "published," "promulgated" or "made available to users" allegedly misleading content provided by third-party advertisers. After Zynga moved to dismiss that complaint based on CDA immunity, Swift stripped those specific words from her complaint and instead conclusorily asserted – fifteen times in eight pages –that Zynga had "created and developed" the content that supposedly misled her.

Now Swift flip-flops once more, asserting that Zynga's liability is based on its alleged knowledge of, and complicity in, third parties' scams. Opp. at 11-12. While her opposition to Zynga's motion blurs the roles of the various parties, Swift's theories emerge much more clearly in her opposition to Adknowledge's motion. There, she alleges both that, "Adknowledge solicits scams from hundreds or thousands of **third party operators**" and that the allegedly fraudulent content that allegedly harmed her came from "**third party scam artists**." Opp. to Adknowledge Mot. at 1, 11 (emphasis added). In other words, Swift actually concedes that, contrary to the mantra of her complaint, the offensive content was *not created or developed* by Zynga, but rather came from the "hundreds or thousands" of "third party scam artists. *Id.* Thus, the only "conduct" of Zynga that Swift ultimately complains about is Zynga's willingness to permit third parties to advertise on its platform, in spite of its alleged knowledge that some of the resulting ads would be scams.

While Swift seeks mightily to recast her claims as arising from something other than Zynga's

7

operation of a website through which harmful third-party content was made available, she cannot escape from the fact that this is the most basic nature of her claims. Contorted efforts exactly like this by other plaintiffs – to try to avoid CDA immunity by pretending their claims arise from something other than hosting or disseminating third party content – have been rejected by the Ninth Circuit and this Court. *Barnes*, 570 F.3d at 1101-1102; *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3 (N.D.Cal. 2008) ("*Goddard I*"). In *Goddard*, this Court rejected the plaintiff's "impermissible recharacterization" of a claim as involving independent conduct and instead held that the claim sought to treat Google as a publisher because, at the core, plaintiff alleged "she was harmed because Google hosted certain online [third-party advertising] content." *Id.*

The Ninth Circuit has unequivocally stated that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommate.com, LLC*, 521 F.3d at 1170-71. The reason for this is straightforward – such activities are "quintessentially that of a publisher." *Barnes*, 570 F.3d at 1103. This rule holds true even if a host platform knows about the allegedly unlawful content and does nothing to prevent it. *Roommate.com*, 521 F.3d at 1169, fn. 24; *Zeran v. America Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997); *Gentry v. eBay*, 99 Cal.App.4th 816, 835 (2002); *Goddard I*, 2008 WL 5245490 at *3 ("even if a service provider knows that third parties are using such tools to create illegal content, the service's provider's failure to intervene is immunized"). And the rule also holds equally true "even where the interactive service provider has an active, even aggressive role in making available content prepared by others." *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998).

In sum, Swift claims she was duped by "third party scam artists" (in her words, "disreputable third parties") whose advertisements were made available through Zynga's platform. She saw and clicked on two such ads while visiting Zynga's website, was then sent to the third parties' websites and saw additional non-Zynga content there, accepted the third parties' offers, and then allegedly did not get *from the advertiser* what she expected to get based on the content of those ads. According to Swift, Zynga should be held liable because it allowed these ads to be available through its platform. But this hosting of third-party content is the quintessential type of conduct for which the CDA provides immunity.

### b. Swift's Citations Support *Zynga's* Position Rather Than Her Own.

Swift claims *Barnes* supports her position and then cites decisions from other jurisdictions and unpublished opinions to try to demonstrate that her claims do not seek to treat Zynga as a publisher. These cases do not assist Swift.

First, Swift claims that *Barnes* is supportive because the Ninth Circuit distinguished between liability, on the one hand, for doing/not doing an act (publishing), and, on the other, for *contractually promising to an individual* to do/not do an act (promising to publish/remove content). 570 F.3d at 1107. The Ninth Circuit held that CDA immunity applied to the former but not the latter. *Id*. This distinction is irrelevant in the present case. Swift does not allege any facts that suggest either (1) that Zynga made any promise to her or (2) that Zynga breached any such promise. As discussed previously, *Barnes* supports Zynga's position – that Swift is impermissibly attempting to recharacterize her claims to avoid Zynga's entitlement to CDA immunity.

Swift then cites the concurring opinion in a Tenth Circuit case, *F.T.C. v. Accusearch Inc.* 570 F.3d 1187 (10th Cir. 2009) *even though the majority explicitly rejected the concurrence's approach* with respect to the "publisher" issue. *Id*. at 1197. In that case, the defendant had structured its website as a classic retail outlet, and its direct business was to obtain and then re-sell illegal private information about individual's telephone calls. *Id*. at 1191, 1192. The website's business included advertising its service of providing such illegal information, processing customer payments, and delivering the subsequent reports to customers as if the reports were its own, even stripping out information revealing the original source of the data. *Id*. The website operator's CDA defense – that it was merely republishing information provided by third parties – was flatly rejected by the majority. The court based its decision on the third CDA prong – the website was considered to have created and developed the content because its entire goal was "to *transform*" inaccessible and private telephone data "into a publicly available commodity." *Id*. at 1199 (emphasis added). Critically, though, the majority declined to endorse the concurring judge's distinction between "content" and "conduct" – a near-impossible distinction to make online. To the majority, it was clear that the FTC's claims treated the website operator as a publisher. Under the heading "Treatment as a Publisher or Speaker," the majority stated:

9

> Turning to the second requirement for CDA immunity, we refrain from adopting the concurrence's view that the CDA does not protect Accusearch because Accusearch's liability under the FTCA is not based on its being a publisher or speaker. According to the concurrence, "the FTC sought and ultimately held Accusearch liable for its conduct rather than for the content of the information it was offering on the Abika.com website." Op., (Tymkovich, J., concurring) at 2. It appears to us, however, that Accusearch would not have violated the FTCA had it not "published" the confidential telephone information that it had improperly acquired....

*Id.* at 1197. Swift's reliance on a squarely rejected concurrence from another jurisdiction demonstrates the lack of support for her position.

The other two district court cases Swift cites are equally unavailing. The three-paragraph CDA analysis in a New Jersey case involving an entirely different setting – liability for selling trademarked keywords – did not even consider whether the defendant was being treated as a publisher. *800-JR Cigar v. GoTo.com*, 437 F.Supp.2d 273, 295 (D.N.J. 2006). It merely held that the act of fraudulently selling trademarked keywords to competitors did not receive CDA protection. *Id.* Moreover, that brief ruling clearly erred when it held that the website GoTo.com was not the provider or user of an interactive computer service. *Id.* That holding is contrary to the overwhelming majority (if not all) reported CDA cases.

Finally, in *Mazur v. eBay Inc.*, 2008 WL 618988, *9 (N.D.Cal. 2008), which Swift asserts demonstrates a difference between "content" and "conduct," Judge Patel held only that eBay could be held liable for its "own statements regarding the safety, circumstances and caliber of its live auctions." These "statements" were the "conduct" at issue. And in the next paragraph, Judge Patel stated: "However, plaintiff's assertion that eBay knew of the seller's illegal conduct and failed to prevent it is nevertheless under the ambit of section 230." *Id.* Swift has not, and cannot, identify any statements or promises by Zynga that were unlawful and caused her harm. Instead, she bases liability on Zynga's alleged knowledge of, and tacit acceptance of, the content of "third party scam artists." Congress has instructed courts to apply the CDA in such situations.

### 4. Zynga Did Not Create Or Develop The Content That Caused Swift's Alleged Harm.

Swift's boilerplate assertion that Zynga somehow "developed and created" the allegedly harmful content is not sufficient to avoid Section 230 immunity. As this Court held in *Goddard*,

10

such allegations "are mere 'labels and conclusions' amounting to a 'formulaic recitation of the elements' of CDA developer liability, and as such, they 'will not do.'" *Goddard*, 640 F.Supp.2d at 1196, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). "Rather, the Court must examine the pleading to determine whether Plaintiff alleges mechanisms that plausibly suggest the collaboration, control, or compulsion [of defendant] in the creation of the offending [advertisements.]" *Id*. See also *Nemet Chevrolet, Ltd. V. Consumeraffirs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (rejecting plaintiff's contention that it had pled around Section 230 immunity, where plaintiff's allegations were "threadbare and conclusory"). Swift's allegations cannot survive such scrutiny.

None of the facts alleged by Swift supports or substantiates her conclusory assertion that Zynga "created and developed" the allegedly harmful content. Zynga created an advertising platform for any third party to use. Zynga allowed third-party advertisers to reward a user for completing their offers by buying virtual currency for that users. Some of the ads that the *third parties* created were allegedly scams. But rather than pursue those advertisers, Swift impermissibly chooses to pursue Zynga, which did not create or develop the content that caused Swift's harm.

In her opposition to Adknowledge's motion to dismiss, Swift makes clear how she believes the various defendants are related to the advertisers who allegedly caused Swift's harm. There, Swift states that "Adknowledge serves as a broker or 'middle man' between Zynga and third parties." Op. to Adknowledge Mot. at 1. According to Swift, "Adknowledge solicits scams from hundreds or thousands of third party operators and then helps these operators place their scams" on Zynga's website. *Id*. Therefore, even by Swift's own account, the *offensive* content that she is suing over – for example, the ad that allegedly promised Swift a "risk-free Green Tea Purity Trial" – was created and developed by persons or entities other than Zynga.

Nonetheless, Swift claims that Zynga was responsible for the creation and development of the offending content. To support this theory, Swift points to language from the Ninth Circuit's *Roommate.com* case concerning how a website operator's "material contribution" to illegal content emanating from a third-party might allow a court to conclude that the host website "created or developed" that content. There are two major flaws in this theory.

11

First, Swift fails to acknowledge the critical factual distinction between her case and *Roommate.com*. In *Roommate.com*, the Ninth Circuit held that the website did not have CDA immunity only with respect to illegal discriminatory content that the website systematically **required** its users to express as a condition for posting on the website. 521 F.3d at 1165. Even though the users in that case technically had "created" the content in question by selecting one of several options, the user *was forced* to make such an election. The Ninth Circuit emphasized that the take-it-or-leave-it nature of this part of the website, the fact that users "c[ould] not refuse to answer [the discriminatory questions] if they want[ed] to use defendant's services," made the website a "developer" of the offensive content. *Id.* at 1166. The Ninth Circuit was very careful not to open Pandora's box with its ruling, as Swift would now like to do. It provided examples of immunized conduct, including "If an individual uses an ordinary search engine to query for a 'white roommate,' the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing neutral tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception." *Id.* at 1169 (emphasis in original). Here, it would be absurd — and wholly unsupported by any of the FAC's specific factual allegations — to assert that Zynga *required* its advertisers to deceive or defraud Zynga's own users. As Swift describes, Zynga allowed third-party advertisers to buy virtual currency with which they could reward users if the user accepted their offer, Compl., ¶ 8, and Zynga made this system available to all advertisers who signed up with one of the advertising aggregators, Opp. to Adknowledge Mot. at 1. But neither these assertions, nor any other fact alleged in the complaint, would support the proposition that the Zynga website directed third-party advertisers to include unlawful content in their ads.

As this Court only recently held, the operator of an online advertising platform does not materially contribute to illegality, and thereby become a "developer" of the advertising content made available through the platform, merely because it "should have known that the availability of certain tools might facilitate the posting of improper content." *Goddard II* 640 F.Supp.2d at 1197-1201. At most, Swift alleges that Zynga created a platform for all advertisers to use and knew that some third party advertisers might try to induce users to accept offers that were misleading or fraudulent.

12

Zynga vehemently denies this, but even accepting it as true, as the Court must on a motion to dismiss, such facts would not convert Zynga into a creator or developer of the content at issue, nor deprive it of CDA immunity.

## IV. Swift Is Not "Enforcing" Federal Wire Fraud Statutes

Swift correctly observes that there is an exception to CDA immunity regarding the *"enforcement"* of federal criminal statutes. The statute provides "Nothing in this section shall be construed to *impair the enforcement of* section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute." 47 U.S.C. § 230(e)(1) (emphasis added). But Swift is incorrect that the exception applies to this case, a private civil action.

In the CDA, Congress established the general rule of immunity, subject to narrowly defined exceptions in Section 230(e) for (1) enforcement of federal criminal statutes; (2) intellectual property laws; and, (3) communications privacy laws. *See* 47 U.S.C. § 230(e)(1)-(2),(4). The exception in Section 230(e)(1) pertains only to the "enforcement" of a "Federal criminal statute" - that is, federal criminal prosecutions - and therefore does not encompass civil claims brought by private litigants, even if the claims arise under statutes that also relate to crimes. As used in the CDA, the word "enforcement" inherently relates to government action by "law enforcement" officials. Indeed, Congress also stated in Section 230 that one of the CDA's purposes was "to ensure vigorous *enforcement* of Federal criminal laws to *deter and punish* trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. § 230(b)(5) (emphasis added). Congress' use of "enforcement" in conjunction with the terms "deter" and "punish," indicates that the exception is intended to relate to criminal prosecutions and penalties.

The very same argument that Swift tries to advance here was raised by the plaintiff in *Goddard v. Google* and rejected by Judge Fogel. There, the plaintiff argued that her UCL claim was based on a federal money laundering statute, 18 U.S.C. § 1957, and thus fell within the Section 230(e)(1) exception to CDA immunity. Judge Fogel cited the policy section of the CDA discussed above, and flatly rejected the "potentially vast expansion of § 230 to include criminal provisions that are enforceable privately only through state law." *Goddard I*, 2008 WL 524549, *5 fn 5. Swift's

13

attempt to do an "end around" the CDA by invoking federal wire and mail fraud statutes (18 U.S.C. §§ 1341, 1343) should be similarly dismissed.

### V. In the Alternative, Swift's Claims Cannot Survive a Motion To Dismiss Because She Has Not Identified Sufficient Facts Of Zynga's Alleged Fraudulent Conduct

Even if the Court were to determine (contrary to all of the foregoing) that the CDA does not compel dismissal of Swift's claims against Zynga, those claims plainly fail for the independent reason that Swift has failed to plead the elements of her claims, which sound in fraud, with particularity.

Plaintiff criticizes Zynga for relying on binding Ninth Circuit precedent to establish that she needed to plead the elements of her fraud claims with particularity. Swift would rather rely upon unpublished district court opinions, such as *Gruen v. EdFund*, 2009 WL 2136785, 2009 U.S. Dist. Lexis 60396 (N.D.Cal. 2009). *See* Opp. at 20-21. In *Gruen*, however, Judge White confirmed Zynga's position. The Court held that *some* claims "falling under the fraudulent prong of Section 17200" did not need to plead every common law element with particularity, such as when a plaintiff merely alleged representations that were likely to deceive. 2009 WL 2136785 at *5. However, *in the same paragraph*, the Court contrasted that situation with one where the plaintiff's claim is "predicated on a fraudulent scheme." *Id.* The Court made clear that in those situations a plaintiff must follow *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1101, 1105 (9th Cir. 2003), which held that claims based on an alleged "unified fraudulent course of conduct" must plead the elements of a fraud claim with particularity. *Id.*; see also *Kearns v. Ford Motor Co.*, 567 F. 3d 1120, 1126-1127 (9th Cir. 2009) (same holding).

Swift's case centers on a purported "unified fraudulent course of conduct." Therefore, it is entirely appropriate and necessary to hold Swift to the standard of alleging specific facts to spell out each and every element of Zynga's alleged wrongful conduct. Swift has utterly failed, even after having an opportunity to amend and expand her complaint, to meet this standard.

### VI. Even If The Court Were To Believe This To Be A Close Call, It Must Grant The Motion To Dismiss

The Ninth Circuit has recognized that Section 230, as an immunity statute, "must be interpreted to protect websites not merely from liability, but from having to fight costly and

14

Zynga – Reply Brief re: Motion to Dismiss First Amended Complaint
CV 09-5443 SBA

protracted legal battles." *Roommate.com*, 521 F.3d at 1174, 1175. Therefore, in cases such as this one, any doubts regarding the applicability of Section 230 "must be resolved in favor of immunity." *Id.* at 1174. As this Court recently said:

> [There is] a special form of "prejudice" to defendants who improperly are denied early dismissal of claims falling within the zone of CDA immunity. As the [Ninth Circuit] has stated in *Roommates*, "close cases . . . must be resolved in favor or immunity, lest we cut the heart out of section 230 by forcing websites to . . . fight[] off claims that they promoted or encouraged — or at least tacitly assented to — the illegality of third parties."

*Goddard II*, 640 F.Supp.2d at 1202 (*quoting Roommate.com,* at 521 F.3d at 1174, 1175). Therefore, even if this were a close case (which we respectfully submit it is not), it would still be clear that dismissal -- with prejudice -- is warranted now.

## VII. Conclusion

For the reasons stated in the previous sections of this brief, Zynga's motion should be granted with prejudice. At this juncture, it is clear that no further spinning of facts and no further reformulation of legal theories will remove the CDA immunity to which Zynga is entitled. Congress' intent and the holdings of the Ninth Circuit and this Court warrant dismissal of Swift's action with prejudice.

Dated: June 15, 2010              DUANE MORRIS LLP


                                  By:      /s/
                                       Richard L. Seabolt
                                       Suzanne R. Fogarty
                                       Oliver E. Benn
                                       Attorneys for Defendant,
                                       ZYNGA GAME NETWORK INC.

DM1\2222212.6

1.
2009)"
☐☐Gr